## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| S.C., by her parent and next friend KARRIE CONLEY; K.C., by her parent and next friend KARRIE CONLEY; and R.H., by his parent and next friend MICHELE HUDAK, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> LUCY CALKINS; IRENE FOUNTAS; GAY SU PINNELL; RWPN, LLC, d/b/a THE READING & WRITING PROJECT AT MOSSFLOWER, LLC; TEACHERS COLLEGE, COLUMBIA UNIVERSITY; FOUNTAS AND PINNELL, LLC; GREENWOOD PUBLISHING GROUP, LLC, d/b/a HEINEMANN PUBLISHING; and HMH EDUCATION CO., <br><br> Defendants. | Case No. 1:25-cv-10007 <br><br> Hon. Richard G. Stearns <br><br><br><br><br> **JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

1.      Plaintiffs bring this case in response to the deceptive and fraudulent marketing and sale of products and services which are undermining a fundamental social good: literacy.

2.      For more than half a century, it has been widely understood that systematic and explicit phonemic awareness and phonics instruction are critical to success in learning to read. As the National Reading Panel commissioned by Congress in 1997 confirmed, all credible education and literacy research shows that daily phonics instruction is necessary for literacy success.

3.      Ignoring that scientific consensus, Defendants—the creators, publishers, and promoters of reading curricula and related services marketed under the Fountas & Pinnell, *Units of Study*, Teachers College Reading & Writing Project, or Reading & Writing Project at Mossflower trade names—peddled a raft of products and curricula that sought to diminish and even exclude systematic and daily phonics instruction (the "Literacy Products"). Defendants

denigrated phonics at worst and paid mere lip service to phonics at best. In all events, Defendants failed to warn parents or school districts that their alleged literacy training products did not include meaningful phonics instruction, the one thing essential to literacy success.

4.    As part of a concerted effort to increase sales of the Literacy Products, Defendants claimed that their literacy offerings were "research-backed," "research-based," "data-based," based on "gold-standard" research, and fit for the purpose of providing early literacy instruction (the "False Representations").

5.    But the above representations were false. The research is overwhelmingly to the contrary and Defendants knew or should have known but failed to disclose that, due to the failure to include explicit and systematic phonics instruction, the Literacy Products were not fit to provide early-literacy instruction. Indeed, the few studies that Defendants have cited in support of their approaches are unreliable, methodologically flawed, and lack sound theoretical or empirical foundations. Defendants likewise attempted to boost their credibility by selling literacy assessments created to "validate" their own products. But those assessments measured a child's ability to read about as accurately as a coinflip.

6.    For years, Defendants hawked their defective goods and services to school districts throughout the country, including throughout the Commonwealth of Massachusetts. This fraudulent and deceptive campaign has had devastating consequences. In 2023, for example, less than *half* of all Massachusetts third graders satisfied the Commonwealth's expectations for performance on the Massachusetts Comprehensive Assessment System English Language Arts exam. Students from minority groups or with learning disabilities fared even worse. Along with the direct impacts on children, families across the Commonwealth have scurried to procure remedial literacy instruction, the cost of which is out of reach for many. Even when families can

afford remedial support, it often comes too late, sabotaging children's educational development, career prospects, and fundamental sense of self-worth.

7.     Accordingly, Plaintiffs, on behalf of themselves and a class of students injured in Massachusetts by Defendants' deceptively marketed and Literacy Products, sue to obtain long overdue accountability, remedy the harms from Defendants' conduct, and secure immediate relief.

## **PARTIES**

*a.     Defendants: Creators and Publishers of Early-Literacy Products*

8.     Since the mid-1990s, Defendants have marketed and sold an array of early-literacy products—including teacher training courses, curricula, assessment testing products, and basal readers—to thousands of school districts across the country and the Commonwealth.

9.     Defendant, Lucy Calkins, is the Robinson Professor in Children's Literature at Teachers College, Columbia University and the creator of the *Units of Study* curriculum discussed below. Upon information and belief, Defendant Calkins is a resident of Connecticut.

10.     Defendant, Teachers College, Columbia University ("Teachers College"), is a private, non-profit graduate school organized under New York law with its principal place of business at 525 West 120th Street, New York, NY 10027.

11.     Lucy Calkins founded the Teachers College Reading & Writing Project ("TCRWP") in 1981 as a think tank, field-based research team, and provider of curriculum and professional development.  TCRWP has functioned as an instructional consultancy housed at Teachers College, which employed the "Units of Study curriculum guidebooks and the 'workshop' method for reading and writing instruction that she created." https://www.tc.columbia.edu/articles/2016/june/tcs-lucy-calkins-talks-with-teacher-magazine/

12.     Teachers College has received tens of millions of dollars in service contracts issued TCRWP for consulting services it offers to schools and districts across the country.

13.     Units of Study is available at the Teachers College Library. https://teacherscollege.primo.exlibrisgroup.com/discovery/search?tab=Everything&search_scope=MyInst_and_CI&vid=01TCCU_INST:01TCCU&query=any,contains,Units%20of%20Study

14.     The Units of Study website prominently features Teachers College Reading and Writing Project.  https://www.unitsofstudy.com/classroomlibraries/

15.     According to a September 1, 2023 post on the Teachers College website:

For many years, TCRWP's founding director Lucy Calkins led efforts to support teachers as they develop students as readers and writers. Dr. Calkins has stepped down as Director of the Reading and Writing Project. She is Robinson Professor in Children's Literature at Teachers College, a tenured faculty member in the Department of Curriculum and Teaching, on sabbatical during the 2023-2024 academic year.

"Many teachers credit TCRWP for creating communities of practice where teachers gain valuable resources and support," says KerryAnn O'Meara, Vice President for Academic Affairs, Provost and Dean of the College. "TC is grateful to Dr. Calkins for her service."

Dr. Calkins shares her expertise as a consultant through her own LLC. Teachers College is not involved in the operations or provision of services provided by Dr. Calkins in her LLC.

https://www.tc.columbia.edu/articles/2023/september/advancing-literacy-through-teachers-college-programs-research-and-partnerships/

16.     After she stepped down as director of TCRWP, Calkins and her team continued offering professional development services through Defendant RWPN LLC, d/b/a The Reading & Writing Project at Mossflower, LLC ("Mossflower"), which is a Connecticut limited liability corporation with its principal place of business at 125 Strathmore Road, Middlebury, CT 06762. Lucy Calkins is the Founding Director of Mossflower.

17.     A number of staff members from Teachers College joined Calkins at the newly formed Mossflower.

18.    At Mossflower, "Lucy Calkins and her team of experienced educators author[ed] the Units of Study in Reading, Writing, and Phonics for grades K through 8…" https://mossflower.com/our-story/  In connection with the literacy products it creates, "Mossflower [states that it] provides state-of-the-art professional development services to K-8 educators… on reading, writing, and phonics."  *Id*.  Mossflower's website publicizes that "Lucy Calkins leads Heinemann Officers Hours featuring the Units of Study on the first Thursday of every month. Educators learn from the curriculum, Units of Study, as it is designed to not only support children, but to also support those who work with children."  *Id*.

19.    Units of Study can be purchased through Mossflower's website, which links to the Heinemann website, where institutional purchasers are able to locate their local Heinemann Sales Representative and purchase materials online.  Units of Study in Writing, Grades K-2 | Mossflower https://mossflower.com/products/units-of-study-in-writing-grades-k-2/

20.    Defendant, Irene Fountas, is the Marie M. Clay Endowed Chair in Early Literacy and Reading Recovery at Lesley University and one of the creators of the *Fountas & Pinnell Classroom* curriculum, *Leveled Learning Intervention*, and *Fountas & Pinnell Benchmark Assessment System* (the "F&P Literacy Products"), all discussed below. Upon information and belief, Defendant Fountas is a resident of Massachusetts.

21.    Defendant, Gay Su Pinnell, is Professor Emerita in the School of Teaching and Learning at The Ohio State University and one of the creators of the *F & P Literacy Products*. Upon information and belief, Defendant Pinnell is a resident of Ohio.

22.    Defendant, Fountas and Pinnell, LLC ("F&P LLC"), is an Ohio limited liability corporation with its principal place of business in Columbus, Ohio. The F & P Literacy Products can be purchased through the Fountas and Pinnell website, https://www.fountasandpinnell.com/,

which links to the Heinemann website that allows institutional purchasers to find their local Heinemann Sales Representative or to purchases materials online. The F&P website contains numerous misrepresentations concerning the Literacy Products.

23.    Defendant, HMH Education Company ("HMH"), is a Massachusetts corporation with its principal place of business at 125 High Street, Boston, MA 02110. HMH publishes, markets, and sells educational materials including *Units of Study*, *Fountas & Pinnell Classroom*, *Leveled Literacy Intervention*, and the *Fountas & Pinnell Benchmark Assessment System*. See e.g. https://www.hmhco.com/shop

24.    Defendant, Greenwood Publishing Group, LLC, d/b/a Heinemann Publishing ("Heinemann"), is a wholly owned subsidiary of HMH with its principal place of business in Portsmouth, New Hampshire. Heinemann publishes, markets, and sells educational materials including *Units of Study*, *Fountas & Pinnell Classroom*, *Leveled Literacy Intervention*, and the *Fountas & Pinnell Benchmark Assessment System*.

  *b.* *Plaintiffs: Parents and Children Exposed to Defendants' Defective Products*

25.    Plaintiffs, S.C. and K.C., are the minor children of Plaintiff, Karrie Conley, and residents of Boxborough, Massachusetts. S.C. and K.C. attended public schools in Acton-Boxborough and Sandwich. S.C. and K.C.'s teachers utilized *Units of Study* and *Leveled Literacy Intervention* and S.C. and K.C. thus were exposed to Defendants' products. As a result of Defendants' misconduct, S.C. and K.C. have suffered a variety of developmental, emotional, and financial injuries shared and borne by Karrie Conley.

26.    Plaintiff, R.H., is the minor child of Plaintiff Michele Hudak and a resident of Ashland, Massachusetts. R.H. attended public schools in Ashland. R.H.'s teachers utilized *Units of Study* and *Leveled Literacy Intervention* and received reading instruction and assessments using

Defendants' defective products. As a result of Defendants' misconduct, R.H. has suffered a variety of developmental and emotional injuries, and financial injuries shared and borne by Michele Hudak.

## JURISDICTION

27.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because this complaint includes class allegations  pursuant to Federal Rule of Civil Procedure 23, the amount in controversy in this case exceeds $5,000,000, exclusive of interest and costs, and Plaintiffs and Defendant HMH are citizens of Massachusetts, Defendants Mossflower and Calkins are citizens of Connecticut, Defendants Fountas, Pinnell, and F&P LLC are citizens of Ohio, Defendant Heinemann is a citizen of New Hampshire, and Defendant Teachers College is a citizen of New York.

28.    This Court has personal jurisdiction over the Defendants because all Defendants are either citizens of Massachusetts or have transacted business in Massachusetts and committed tortious acts in Massachusetts thus providing jurisdiction through the Massachusetts Long Arm Statute, M.G.L. c. 223A, § 3.

29.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because Plaintiffs reside in this District, Defendants conduct substantial business in this District, because a substantial part of the events and omissions giving rise to this action occurred in this District, and because this action is being brought on behalf of a class of Massachusetts users of Defendants' products and is brought under the laws of the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### I.    THE LONG-SETTLED CONSENSUS REGARDING SYSTEMATIC PHONICS INSTRUCTION.

30.    Literacy—the ability to read—is the foundation of early-childhood education. Accordingly, educators in kindergarten, first-grade, and second-grade classrooms have long

focused much of their efforts and classroom time on reading, understanding that their students' success in later grades will depend in large part on their continued ability to read at grade level. As described colloquially, the pedagogical focus between kindergarten and second grade is on "learning to read." From third grade onward, children "read to learn."

31.    The building blocks of effective early-literacy instruction are well-known and straightforward. For decades, scientists and educators have understood that the first step in teaching literacy is robust, daily, and extensive instruction in phonics.

32.    Phonics is about understanding the connection between how the written letters on the page (the graphemes) relate to the corresponding spoken sounds (the phonemes) of a word. The basics of phonics will be familiar to most people who have or had small children, or who remember being taught to read in school. A student learning to read the word *cat*, for example, is taught to "sound out" the word by breaking down the three graphemes (letters) into their phonemic components: the sounds c-, *a*-, and -*t*. With proper instruction in how to use that "sounding out" tool, the student learns to blend the distinct sounds into a single word—"cat"—and to recognize the same grapheme/phoneme correspondence in similar words (*e.g.*, r***at*** or h***at***). Eventually, the decoding and blending process becomes second nature, enabling the student to read new and complex words, and setting the stage for more advanced reading, writing, and comprehension. The importance of systematic phonics instruction in literacy education is common sense, but it is also backed by decades of robust science. Since at least the 1960s, this research has revealed strong correlative and causal relationships between systematic phonics instruction and reading success. Researchers have conducted correlative and experimental study after study confirming that phonemic awareness and letter knowledge best predict how well children will learn to read during the first two years of elementary instruction. That science is not in dispute.

33.    In 1997, Congress convened a National Reading Panel (the "Panel") to study American early-literacy instruction. The Panel published its findings in 2000. Relying on the robust body of research just discussed, the Panel concluded that "**teaching children to manipulate phonemes in words was highly effective under a variety of teaching conditions with a variety of learners across a range of grade and age levels and that teaching phonemic awareness to children significantly improves their reading more than instruction that lacks any attention to [phonemic awareness]**."

34.    In particular, the Panel cited 38 studies testing the efficacy of phonics instruction on literacy outcomes. These studies showed that systematic phonics instruction gave children a faster start in learning to read; improved kindergarten and first-grade students' word recognition, spelling skills, and reading comprehension; improved second-grade and older struggling students' word recognition skills; and convincingly outperformed other approaches in which teachers were expected to improvise phonics instruction as needed.

35.    According to the Panel report, **"[t]he meta-analysis indicated that systemic phonics instruction enhances children's success in learning to read and that systemic phonics instruction is significantly more effective than instruction that teaches little or no phonics… These facts and findings provide converging evidence that explicit, systemic phonics instruction is a valuable and essential part of a successful classroom reading program… [S]ystemic phonics instruction is… a necessary component… of a total reading program…"**[1]

---

[1] The Report contrasts systematic phonics instruction with incidental phonics instruction: "The hallmark of a systematic phonics approach or program is that a sequential set of phonics elements is delineated and these elements are taught along a dimension of explicitness depending on the type of phonics method employed. Conversely, with incidental phonics instruction, the teacher does not follow a planned sequence of phonics elements to guide instruction but highlights particular elements opportunistically when they appear in text."

36.     Soon after the Panel released its report, other English-speaking countries, including Australia (2005) and the United Kingdom (2006), came to the same conclusions. And many other studies subsequently replicated or confirmed the same findings, including research showing a neurological basis for the importance of letter-sound relationships.

37.     Other research has shown that structured, repetitive, and continuous phonics lessons are particularly important for certain sizeable populations of students for whom learning to read may be particularly challenging. This includes students with learning differences, like dyslexia; students learning English as a second language; and students whose backgrounds provide less exposure to reading and writing. Indeed, research has shown that a "structured literacy" approach that teaches phonics systematically has helped re-code a brain predisposed to certain learning differences often connected to literacy delays.

## II.     DEFENDANTS IGNORED THE CRUCIAL ROLE OF SYSTEMATIC PHONICS INSTRUCTION.

38.     Ignoring this expert and research consensus about the essential role systematic phonics instruction plays in successful literacy education, Defendants created, marketed, published, and sold the early-childhood Literacy Products—including curricula, teacher trainings, and alleged literacy assessment tests—that pay lip service to phonics at best and ignore phonics completely at worst. Commentators have thus described Defendants' approach as "vibes-based literacy."

39.     In the 1990s, Defendants, Fountas and Pinnell, together began developing a system of "graded" or "leveled" early-literacy reading courses based on the discredited theories of an early-literacy researcher named Marie Clay. Fountas and Pinnell named their system "Guided Reading." Their flagship product, *Fountas & Pinnell Classroom*, is published and sold by Defendant, Heinemann, and Defendant, HMH. Heinemann and HMH also offer a supplemental program, *Fountas & Pinnell Leveled Literacy Intervention*, advertised to be targeted for children

who struggle with reading and writing. Both products omit systematic phonics instruction and are designed around the "F&P Text Level Gradient," a proprietary scheme that assigns reading materials an A-to-Z grade depending on level of difficulty.

40.     Separately, Defendant Calkins, a self-proclaimed writing specialist at Columbia University's Teachers College, developed her own early-literacy curriculum, *Units of Study*, in the early 2000s. *Units of Study* is also published and sold by Defendants Heinemann and HMH. Like Fountas and Pinnell, Calkins' early-literacy reading and writing textbooks and workshops drew heavily on Marie Clay's theories.

41.     Using Calkins' university's brand cachet, Heinemann badged all of Calkins' *Units of Study* publications until 2023 with Columbia's imprimatur, branding her products as the work of the "Teachers College Research & Writing Project" (the "Calkins' Literacy Products").



https://www.unitsofstudy.com/classroomlibraries/

42.     Defendants' Literacy Products, including *Classroom*, *Leveled Literacy Intervention*, and *Units of Study*, were all published by Heinemann and all omitted systematic

structured phonics instruction. From inception, this was a feature of Heinemann's Literacy Products line, not a bug. The Literacy Products did not put phonics at the center, or even to the side of, their curriculum. Many of their mainstream products did not include phonics at all.

43.    Throughout the 1990s and 2000s, Heinemann published a series of anti-phonics monographs that cast proponents of a scientifically grounded and research-backed method of reading instruction—phonics—as dangerous tools of both the political left and the political right. In titles like *Unspeakable Acts, Unnatural Practices: Flaws and Fallacies in "Scientific" Reading Instruction* and *Big Brother and the National Reading Curriculum*, Heinemann's authors contended that: (a) "[s]ystematic phonics is destined to fail as a method of teaching reading, and will make learning to read more difficult for many children";  (b) "[p]honemic awareness is a spurious concept"; and (c) instruction in both subjects was "the thin end of a wedge to bring about radical changes of education."

44.    Other Defendants echoed Heinemann's high-pitched anti-phonics propaganda in their own marketing materials. In 2019, for instance, Teachers College published a post on its website evidently intended to discourage teachers from providing phonics instruction: "Every minute [teachers] spend teaching phonics (or preparing phonics materials to use in your lessons) is less time spent teaching other things."

45.    Defendants' ideological aversion to phonics instruction carried over to their Literacy Products. In place of a curriculum that prioritized daily and systematic phonics instruction, Defendants' Literacy Products offered only: (a) brief "minilessons" (*i.e.*, actual reading instruction) followed by large amounts of shared reading (in which the teacher reads aloud to students and asks questions about the text); (b) guided reading (in which students select texts to read on their own and then discuss with the teacher); and (c) independent reading. Cozy as these

independent-reading sessions may sound, none of them include systematic instruction or practice with the phonetic tools that undisputed research long has shown allows children to learn to read more effectively

46.     Another key component of *Classroom*, *Leveled Literacy Intervention* and *Units of Study* are so-called "cueing" methods, which purport to teach children to use pictures and syntax—rather than visual information from letters—to identify unfamiliar words. For example, a teacher may project a sentence and an associated picture onto a screen and read aloud. When the teacher comes to a word covered with a sticky note, the teacher prompts the students: "What could this word be? Let's look at the picture." If the student happens to predict the word based on context, the student is considered to have "read" the sentence successfully—even if, as is often the case, the student cannot read the word and would not recognize it in another context.

47.     Cueing methods have been roundly criticized for teaching children to guess rather than read. Critics have explained that cueing teaches kids "to read like poor readers rather than good readers." Indeed, even if children can fake the ability to read using cueing or other guessing techniques in the first few years of school, those strategies leave them unequipped when they reach higher grade levels. Thanks to Defendants' success in selling their defective Literacy Products, it is now common for teachers to see cohorts of third, fourth, or fifth graders who—despite having received alleged literacy instruction in earlier class years—do not actually know how to read.

48.     Worse yet, Defendants repeatedly touted their materials as supported by "studies" and "data." For example, Defendants marketed their curricula as: (a) "research-backed," based on "intensive research, testing, and experience," providing "data-based" and "standards-based instruction"; and (b) based on "volume[s] of research" and a "gold-standard" study that prove the "efficacy and value" of their approach.

49.     In contrast to phonics-based early-literacy products—the efficacy of which is undisputed and supported by numerous studies, *see supra* Section I, Defendants' Literacy Products are not backed by or grounded in research. To the contrary, the undisputed scientific consensus—at least since 2000 when the Panel issued its findings—has been that systematic phonics instruction is a necessary element of early-literacy education and, by extension, that the failure to include systematic phonics instruction in early-literacy curricula amounts to deficient early-literacy education. Notwithstanding this evidence-backed scientific consensus that non-phonics based early-literacy curricula are ineffective, in connection with the marketing, publishing and sale of the Classroom, Leveled Literacy Intervention, and Units of Study Literacy Products, Defendants misrepresented that the Literacy Products were science-backed.

50.     Heinemann's website included the following misrepresentations about Units of Study (with emphasis added):

- "RESPONSIVE, **DATA-BASED** INSTRUCTION" (https://web.archive.org/web/20151204163237/http:/samplers.heinemann.com:80/ruos-series-overview)

- "A **rigorous and responsive** course of study for students" (https://web.archive.org/web/20121021110856/http://www.heinemann.com/shared/onlineresources/E00871/UoSRslidepresmedres.pdf)

- Quoting Calkins: "In every way, we follow the **research** on phonics. [...] Those are our principles: that it's transferrable, efficient, strategy based, engaging, and **research-based**." (https://web.archive.org/web/20200930161955/https://blog.heinemann.com/new-units-of-study-in-phonics-with-lucy-calkins)

- Quoting Calkins: "**When my colleagues and I began the research that has culminated in the publication of this series**, we decided that just as teachers across the world had benefited from working on our own writing process so we could then teach writing as insiders in that process, so too we needed opportunities to invest in our own reading so we could bring that insider's perspective into our reading classrooms." (https://web.archive.org/web/20120916090307/http://www.heinemann.com/shared/onlineresources/E00871/RUOS_Guide_EssentialsReading.pdf at page 6.)

- The website contains links to data reports and case studies concerning Units of Study. See https://www.heinemann.com/research/#dr

## Units of Study Research Base

Teachers College Reading and Writing Project is a think tank that has long built its ideas and practices off of established and new research. Download the Research Base document for a summary of some of TCRWP's key beliefs and practices as well as a summary of the research that informs their work.

### Research Base

51.    The Units of Study website included the following misrepresentations (with emphasis added):

- **Based on 30 years of intensive research, testing, and experience in diverse classrooms across the country**, the new Units of Study for Teaching Reading, K-5, series offers **world-class-standards-aligned** reading curriculum to complement the recently published Units of Study in Opinion/Argument, Information, and Narrative Writing, K-5, or to be used as part of any best-practices literacy program.(https://web.archive.org/web/20150315120654/http://unitsofstudy.com/teachingreading/)

- "Pioneered by Lucy Calkins and her TCRWP colleagues and **refined over decades of research and piloting** with thousands of teachers, Lucy Calkins' 5-part workshop framework offers the perfect combination of whole-class, small-group, one-on-one instruction, and independent practice…" (https://web.archive.org/web/20180930130707/http://www.unitsofstudy.com/framework)

- Quote from Calkins: "Workshops are deliberately kept simple and predictable, like an art studio or **a researcher's laboratory**, because it is the work itself that is ever-changing and complex….Each day's teaching in a workshop does not set up a new hoop for the students to all jump through in sync. Instead, for the bulk of time during each day, students carry on with their work. As they do so, they draw upon a growing repertoire of skills, tools, strategies, and habits." (https://web.archive.org/web/20121021110856/http://www.heinemann.com/shared/onlineresources/E00871/UoSRslidepresmedres.pdf at page 12)

- "Following on the success of the *Units of Study in Opinion, Information, and Narrative Writing*, the *Units of Study for Teaching Reading, K–5* offers grade-by-grade curricula in reading designed to meet ambitious 21st-century global standards. **Drawing on learning gleaned from decades of research, curriculum development, and working shoulder-to-shoulder with students, teachers, and school leaders**, this new reading series will be rooted in the Project's best practices

15

and                    newest                    thinking.
([https://web.archive.org/web/20151120041820/http://www.unitsofstudy.com/teac](https://web.archive.org/web/20151120041820/http://www.unitsofstudy.com/teachingReading/default.asp)
[hingReading/default.asp](https://web.archive.org/web/20151120041820/http://www.unitsofstudy.com/teachingReading/default.asp))

52.    Fountas and Pinnell likewise misrepresented that their Literacy Products were

research-backed:

- The Fountas and Pinnell website includes a page devoted to research:  "Fountas
  and Pinnell share a long history of writing books and materials that are research-
  based and practical for teachers to use. As a result they are committed to the
  important role of research in the development and ongoing evaluation of all of
  their reading, writing, phonics and classroom resources."
  ([https://www.fountasandpinnell.com/research/](https://www.fountasandpinnell.com/research/))  The page provides tabs for each
  of the F&P Literacy products:



- Fountas and Pinell wrote that the F&P Literacy Products "are the result of over two
  decades of our research and practical work with teachers… In developing [Leveled
  Literacy Intervention]… we designed a researched-based framework for
  intervention lessons…"  *See The Fountas and Pinnell Story*, published 11/15, pages
  1-2.

- In a 2010 article they authored for Scholastic entitled "Research Base for Guided
  Reading as an Instructional Approach", Fountas and Pinnell wrote about their
  guided reading program and described the "research base… components of reading
  instruction."
  [https://teacher.scholastic.com/products/guidedreading/pdf/2.0_InYourClassroom/](https://teacher.scholastic.com/products/guidedreading/pdf/2.0_InYourClassroom/GR_Research_Paper_2010.pdf)
  [GR_Research_Paper_2010.pdf](https://teacher.scholastic.com/products/guidedreading/pdf/2.0_InYourClassroom/GR_Research_Paper_2010.pdf)

- On October 27, 2022, Fountas and Pinnell published a blog post titled "Get the
  Facts: Responding to Misinformation About Fountas and Pinnell Literacy" where
  they doubled down on their false claims regarding the "research that proves the

efficacy and value of [their]work." (https://fpblog.fountasandpinnell.com/fact-check-responding-to-misinformation-about-fountas-and-pinnell-literacy):

*"there is a volume of research that proves the efficacy and value of that work"*



*"have been proven effective through independent studies, including a gold standard study"*

Misinformation
Fountas & Pinnell Literacy resources are not effective

Fact
**Fountas & Pinnell Literacy™ resources have been proven effective through independent studies, including a gold standard study endorsed by the U.S. Department of Education's What Works Clearinghouse.** Learn more here: https://downloads.heinemann.com/fp-lli

*Leveled Literacy Intervention (LLI)* has demonstrated statistically significant positive effects on students' general reading achievement and fluency, as well as decoding skills, as measured by the Dynamic Indicators of Basic Early Literacy Skill (DIBELS) nonsense word fluency subtest. This was shown through a "proven effective" rating based on ESSA (Every Student Succeeds Act) standards through rigorous randomized controlled trial studies. Learn more here: https://www.fountasandpinnell.com/research/fpc/

An analysis of the National Assessment of Educational Progress (NAEP) report card released in October 2022 showed that many of the top-performing districts used Fountas & Pinnell Literacy™ resources. For example, in South Carolina, a state without any declines in NAEP performance, 68% of their top-performing districts utilize a Fountas & Pinnell Literacy™ resource.

"*has demonstrated statistically significant positive effects… with a 'proven effective' rating*"

Misinformation
Fountas & Pinnell Literacy™ does not support students in need of reading intervention.

Fact

**Leveled Literacy Intervention (LLI) has demonstrated statistically significant positive effects on students' general reading achievement and fluency, as well as decoding skills**, as measured by the Dynamic Indicators of Basic Early Literacy Skill (DIBELS) nonsense word fluency subtest. This was shown through a "proven effective" rating based on ESSA (Every Student Succeeds Act) standards through rigorous randomized controlled trial studies. Learn more here: https://www.fountasandpinnell.com/research/fpc/

Further, *LLI* has been proven effective with students with various needs, including those with Individualized Education Plans (IEP). In a 2009-10 study of the progress of students using an LLI curriculum, which included kindergarten through fifth-grade students with an IEP for Reading or other categories (SPED), students made an average of 7.5 months of progress in a little more than 4.5 months.

Learn more here:

Fountas & Pinnell LLI

https://www.fountasandpinnell.com/research/lli/

53.    The Heinemann website includes similar misrepresentations concerning the F&P

Literacy Products:

# Fountas & Pinnell Literacy™

Fountas and Pinnell share a long history of writing books and materials that are research-based and practical for teachers to use. As a result, they are committed to the important role of research in the development and ongoing evaluation of all of their reading, writing, phonics, and classroom resources.

**Visit the Fountas & Pinnell Literacy™ Research and Standards Page**

https://www.heinemann.com/research/#fp

54.    Upon information and belief, however, Defendants conducted no rigorous research

and collected no data (as opposed to anecdotes from adherents) to support their methodologies

until the early 2020s.  Indeed, in January 2021, the American Institutes for Research confirmed

that the products sold by Teachers College had "*never been subjected to a rigorous evaluation* in which the reading achievement of schools implementing [Teachers College] is compared with that of non-[Teachers College] schools."

55.    Ironically, Defendants have pointed to the American Institutes for Research study—and a small number of other, mostly recent studies (some funded by Heinemann)—as proof of the efficacy of their methods, even though all of these studies suffer from glaring methodological, theoretical, and other flaws that wholly undermine that conclusion. The studies on which Defendants rely are not sufficiently reliable to permit one to conclude with reasonable certainty that their Literacy Products are effective. And given the significant limitations and marginal results of these studies, Defendants' reliance on these studies as support for the claim that the Literacy Products are science-backed is misleading.

56.    Defendants intentionally engaged in this unfair, deceptive, and fraudulent course of conduct as part of a continued effort to increase sales of the Literacy Products to schools and school districts, including the public schools in Acton-Boxborough, Sandwich, and Ashland Massachusetts that Plaintiffs, S.C., K.C., and R.H., attended.

57.    The schools and school districts that purchased the Literacy Products—including those that Plaintiffs attended—did so in reliance upon Defendants' misrepresentations that their Literacy Products were science-backed and entered into contracts to purchase the Literacy Products to teach students, including Plaintiffs, to read.  Defendants owed a duty of good faith and fair dealing to the schools and school districts that purchased the Literacy Products and to Plaintiffs whom Defendants obviously had reason to know would be taught using their Literacy Products.  By engaging in their fraudulent and unfair course of conduct as described herein, Defendants breached their duty of good faith and fair dealing not only to the schools and school

districts, but also to the students who attended those schools who are third party beneficiaries of the contracts their schools entered into with Defendants.

**III.    DEFENDANTS' PRODUCTS AND CURRICULA FAILED TO TEACH CHILDREN TO READ.**

58.    For years, Defendants raked in massive profits from selling the defective Literacy Products to school districts throughout the country, including in the Commonwealth.

59.    When Defendants' literacy curricula finally were subjected to rigorous research and testing, though, the results were damning. For example, the *Fountas & Pinnell Benchmark Assessment System* ("BAS"), published and sold by Heinemann since 2007, is marketed as a means of testing whether children are at "grade-level" through a half-hour oral reading exercise using Fountas & Pinnell's graded-reading materials. As with *Classroom*, *Leveled Literacy Intervention*, and *Units of Study*, Heinemann and Fountas & Pinnell touted the BAS as "based on empirical research" and a "reliable and valid measure[] for assessing students' reading levels."

60.    Despite Defendants' representations that the BAS was "research-based," no peer-reviewed study of the BAS's efficacy was conducted until 2015. That year, University of Florida researchers found that the BAS was able to distinguish between proficient and struggling second- and third-grade readers only half the time.  As promoters of Defendants' literacy products, they can be presumed to have known or, in the exercise of due care, should have known about that study's findings and conclusions.

61.    As Dr. Matthew Burns, the study's lead author, later explained, "I could buy this test, train all my teachers to give it, take about 30 minutes per kid. Or [I could] just have a teacher flip a coin for every kid, and they'll get it right just as often."

62.    The study found that the BAS was even *less* accurate when it came to identifying struggling readers—correctly detecting only 31% of those who needed intensive supplemental

instruction. Dr. Burns characterized BAS's performance in this regard as "shocking . . . quite literally the lowest [he had] ever seen." For struggling readers, flipping a coin would more accurately assess their reading performance.

63.    A few years later, Calkins' *Units of Study* was subjected to rigorous scrutiny. Seven leading early-literacy scholars, developmental psychologists, and neuroscientists assembled by the non-profit Student Achievement Partners issued a report concluding that *Units of Study* did not devote enough time to phonics instruction.

64.    The report found this omission "particularly dire for students who might not immediately master [phonics] patterns or read fluently"—in other words, for the very students who needed effective literacy instruction and intervention the most. The Student Achievement Partners report also found that the negative impact of *Units of Study* was "most severe for children who do not come to school already possessing what they need to know to make sense of written and academic English." As the authors explained:

> [T]eachers working in schools where students historically struggle with reading will be highly challenged to differentiate their instruction to meet the needs of the majority of students because the program does not provide them adequate groundwork. Therefore, the program is unlikely to bring all students to reading proficiency.

65.    Rather than addressing the obvious and damaging defects in her products, Calkins rushed to sweep the Student Achievement Partners report under the rug. She emailed thousands of individuals at client schools to warn them of the report's release, stating, "I anticipate that this [study] could create problems for some of you." She also tried to encourage her clients to avoid drawing scrutiny to her methods. As she wrote, "If the report happens to go under the radar, let's let it stay there—be forewarned, but don't amplify it by sharing."

66.    In 2021, EdReports, a leading nonprofit organization that reviews K-12 instructional materials, gave all of Heinemann's flagship early-literacy products—*Classroom,*

*Leveled Literacy Intervention,* and *Units of Study*—the lowest ratings it had ever issued for K-2 curricula in English and language arts.

67.    Discussing *Units of Study*, EdReports concluded that the "[m]aterials do not include systematic and explicit instruction in all foundational skills standards to provide students with opportunities to progress towards reading proficiency." Further criticisms included the lack of: (a) a "research-based explanation for the order of phonological awareness and phonics instruction," of "cohesive and sequential scope and sequence," and (b) "systematic and explicit instruction in all foundational skills standards to provide students with opportunities to progress towards reading proficiency."

68.    So while Defendants have offered products that mention or even include some phonics, they fall far below what is needed to be effective—a fact that Defendants either knew or should have known with the exercise of due care.

69.    In parallel with these reports, public opinion began to turn against Defendants' methods. A series of newspaper articles, podcasts, and legislative and school board hearings shed new light on the dramatic consequences of Defendants' defective literacy products.

70.    In 2020, the school system in Oakland, California abandoned *Units of Study* after parents and the city's NAACP chapter raised concerns that Calkins' methods were not "research-proven."

71.    In 2023, the Chancellor of New York City Public Schools similarly admitted that the city's approach to early literacy—dominated by *Units of Study*—was "fundamentally flawed" and defied the scientific consensus.

72.    Until very recently, Defendants did not disclose the flaws in their products, even though they knew—or should have known—that their curricula ran counter to the scientific consensus among educators, educational psychologists, and other experts.

73.    Remarkably, Defendants continued to promote cueing methods as effective pedagogical tools despite consistent research-backed criticism.

74.    For example, in a 2021 blog post responding to public and academic critiques of their products, Fountas and Pinnell explained that if a reader reads "pony" where it says "horse," the response is still considered "partially correct."

75.    In 2020, Teachers College responded to the Student Achievement Partners study and other negative appraisals by acknowledging that aspects of *Units of Study* needed "rebalancing." In an internal memorandum issued that year, Teachers College finally conceded that "phonemic awareness (PA), the ability to identify and manipulate the sounds of spoken language, is a foundational component of reading success[]."

76.    Yet Teachers College did not take effective action to remedy these deficiencies, nor did it warn schools or teachers of the flaws in its existing products.

77.    Today, nearly forty States and the District of Columbia have passed laws or promulgated regulations requiring that students receive evidence-based reading instruction (including phonics) and/or prohibiting classroom instruction involving Defendants' "three-cueing," "balanced literacy," or their equivalently defective products.

78.    For instance, in 2019, Colorado amended its Reading to Ensure Academic Development ("READ") Act to obligate schools to provide early-literacy programming that is "focused on or aligns with the science of reading, including teaching in the areas of phonemic

awareness, phonics, vocabulary development, reading fluency including oral skills, and reading comprehension."

## IV. DEFENDANTS HAVE REFUSED TO TAKE RESPONSIBILITY FOR THEIR ACTIONS.

79.    Eventually, worried about the loss of their lucrative revenue streams, and unable to deny the increasing drumbeat of outside criticism, some Defendants started to make cosmetic changes to their curricula. These changes were far too little and far too late.

80.    In 2021, Heinemann released a new edition of *Units of Study* that it described as "build[ing] upon the foundational work of the original materials with an increased focus on systematic phonics instruction, inclusive content, and ease of use."

81.    This "increased focus" still provides only meager phonics instruction. Worse, rather than provide these remedial materials to school districts for free, Heinemann sold them as an "update," charging tens or hundreds of thousands of dollars for the privilege of having a marginally less defective early-literacy product.

82.    Fountas and Pinnell, meanwhile, launched a blog reiterating their commitment to their discredited "cueing" theory and arguing against the rising tide of criticism.

83.    It was not until May 2023 that Fountas & Pinnell quietly acknowledged the deafening chorus by announcing the addition of limited phonics instruction to their early-literacy products, though the supplement still did not solve the underlying problem.

84.    Indeed, an EdReports review of a post-restructuring edition of *Leveled Literacy Intervention* concluded that Fountas & Pinnell still had failed to "present a research-based or evidence-based explanation for the sequence" of instruction and did not "consistently devote enough time to systematic instruction in phonological awareness, phonics, and fluency."

85.     Before 2023, Calkins had badged all her *Units of Study* publications and related consulting work with her employer's imprimatur, branding her products as the work of "TCRWP" (referring consumers to her connection to Teachers College).

86.     On September 1, 2023, Teachers College issued a press release stating that "[t]he entity TCRWP, founded in 1981, will be dissolved as part of [a] shift" toward "evidence-based approaches to literacy."

87.     A week later, that press release was updated to state that "[t]his was not a legal definition of dissolve" and that "all existing school partnerships are unaffected and will continue seamlessly." Despite the equivocal language, the message was clear: Teachers College would have nothing more to do with *Units of Study*.

## V.     CHILDREN AND FAMILIES HAVE SUFFERED TREMENDOUSLY FROM DEFENDANTS' DEFECTIVE MATERIALS.

88.     Defendants earned millions of dollars selling their defective products to schools and teachers.

89.     The consequences for Plaintiffs and other children have been catastrophic. Because Defendants' curricula do not contain the building blocks for teaching effective early-childhood literacy, huge numbers of children, including countless children in the Commonwealth, have suffered devastating setbacks in their educational development.

90.     For instance, a *Boston Globe* survey found that in 2023 less than half of all Massachusetts third-graders satisfied performance expectations on the Massachusetts Comprehensive Assessment System English Language Arts exam.

91.     Students from minority groups or with learning disabilities fared even worse: "Roughly 70 percent of Black third-graders, 80 percent of Latino students, and 85 percent of children with disabilities did not meet the state's benchmark."

92.    The *Globe* survey found that "nearly half" of Massachusetts' school systems were continuing to use literacy products, including products authored or marketed by the Defendants, that were considered by the Massachusetts Department of Elementary and Secondary Education (ESE) to be of "low quality."

93.    As the paper observed, "[p]oor children learning to read are now slightly better off going to school in Florida or Mississippi—states that got serious about early literacy years ago— than they are in Massachusetts."

94.    In an attempt to redress the harms caused by reliance on Defendants' products, Massachusetts launched MassLiteracy, a teacher-training initiative that seeks "to empower educators with the evidence-based practices for literacy that all students need" by providing remedial online courses for teachers. But the courses are costly. Some districts, like Boston Public Schools, have spent thousands of dollars per teacher for remedial lessons on structured literacy and phonemic awareness, all to cure what Defendants' defective literacy products long left out.

95.    This disaster is ongoing.

96.    Once children have passed the critical timeframe to learn reading skills through phonics, it is harder to catch up to their peers. Those who cannot catch up often suffer in silence. They display low self-esteem and behavioral difficulties, are anxious about participating in school activities, and hold negative attitudes about learning.

97.    Children outside the most affluent households are uniquely disadvantaged by arrested literacy-skill development, as they are less likely to have access to tutors, private school, or other costly remedial options.

98.    But even families who manage to pay for literacy tutoring, supplemental at-home materials, or private schools still must spend substantial time and money so their children can

develop skills they would have gained had they been provided adequate early-literacy instruction at school.

99.    Children who are susceptible to dyslexia are also at heightened risk of harm from Defendants' defective products.

100.    Adequate phonics instruction can help prevent a child from developing dyslexia in the first instance, but Defendants' Literacy Products do not provide it.

101.    And Defendants' purportedly evaluative products, like the BAS and Text-Level Gradient, fail to accurately identify children who may have a reading disability, further delaying intervention for children in need.

102.    Plaintiffs' personal experiences are illustrative.

103.    Karrie Conley's child, S.C., was taught cueing through Heinemann's *Units of Study*, and then received ineffective assistance through Heinemann's *Leveled Literacy Intervention,* resulting in her reading delays going unnoticed for years. Without the instruction necessary to secure reading proficiency by third grade, S.C. so struggled with her word-based math curriculum that Karrie needed to transfer her to a private school that could redress her literacy deficiencies and attendant educational delays. And even after transferring, S.C. still required year-round private tutoring from fourth through seventh grades to repair the damage done.

104.    Another of Karrie's children, K.C., was exposed to *Units of Study* and *Leveled Literacy Intervention* from kindergarten through second grade, when her parents detected that she also appeared not to be developing the necessary and appropriate literacy decoding skills. Realizing that time was of the essence, Karrie transferred K.C. to a private school to secure access to reading programs and intensive tutoring with systematic phonics instruction.

105.    Sending S.C. and K.C. to private school and securing literacy tutoring cost more than twice what Karrie paid to send another of her children to college.

106.    Michele Hudak's minor child, R.H., was taught using *Units of Study* and *Leveled Literacy Intervention* and received defective assessments through BAS. Despite being unable to read, R.H.'s BAS results suggested that he "read" at grade level from kindergarten through fourth grade solely because he could successfully guess words from pictures. When presented with chapter books in fourth grade, it became apparent R.H. was far behind many of his peers—but the damage already had been done.

107.    Like Karrie, Michelle had to secure private literacy tutoring to address and remediate R.H.'s reading deficits.

## CLASS ALLEGATIONS

108.    Plaintiffs pursue claims for themselves and on behalf of a class of others similarly situated and injured, pursuant to Federal Rule of Civil Procedure (b)(3).

109.    Plaintiffs seek to represent the following Class:

> All children and parents and/or legal guardians of children (1) currently or previously enrolled in kindergarten, first, second, or third grade in a Massachusetts elementary school that purchased, licensed, reproduced, or otherwise employed any Heinemann or HMH early-literacy products marketed under the Fountas & Pinnell, *Units of Study*, Teachers College Reading & Writing Project, or Reading & Writing Project at Mossflower trade names, (2) who failed to meet state benchmarks on the Massachusetts Comprehensive Assessment System English Language Arts exam, (3) who suffered related developmental, emotional, and/or financial injuries as a result, and (4) who reached (or will reach) the age of majority on or after December 4, 2020.

110.    Certification of the Class is appropriate because common questions of law or fact predominate over any questions affecting only individual members, and thus a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

111.   **Numerosity—Fed.R.Civ.P. 23(a0(1):**   The individuals in the Class are so numerous that joinder of all members is impractical. According to the U.S. Department of Education's National Center for Education Statistics, Massachusetts enrolled 926,100 students in its public elementary and secondary schools during the 2023–24 school year. Because the quality and frequency of curricular-purchase reporting varies widely across schools, and because Defendants' sales figures are proprietary and privately maintained, the precise number of class members cannot yet be determined but will be readily ascertainable through discovery.

112.   **Predominance of Common Questions—Fed.R.civ.P. 23(a)(2), 23(b)(3):**   There are questions of law and fact common to the Class's claims that predominate over questions affecting individual Class Members. Among these common questions are:

   a.      Whether Defendants employed unfair and deceptive marketing practices, in violation of M.G.L. c. 93A, § 2, by falsely representing that their early-literacy products were (among other things) "research-backed," "research-based," "data-based," and based on "gold-standard" research;

   b.      Whether Defendants employed unfair and deceptive marketing practices, in violation of M.G.L. c. 93A, § 2, by failing to warn consumers that their early-literacy products did not include explicit and systematic phonics instruction;

   c.      Whether Defendants employed unfair and deceptive marketing practices, in violation of M.G.L. c. 93A, § 2, by selling early-literacy products that Defendants knew or should have known were not fit to provide early-literacy instruction; and

   d.      Whether Defendants' unfair and deceptive marketing practices, including, but not limited to, Defendants' false representations that their early-literacy products were based or grounded in "research" and "data," amounted to common-law negligence.

e.      Whether Defendants' advertisements of the Literacy Products are deceptive or misleading within the meaning of M.G.L. c. 266, §91.

f.      Whether Defendants' advertising of the Literacy Products has deceived and is likely to deceive Class Members and the general public.

g.      Whether Defendants knew or should have known that the false representations they made on their websites and marketing materials were deceptive and/or misleading in violation of M.G.L. c. 266, §91.

113.   **Typicality—Fed.R.Civ.P. 23(a)(3):** Plaintiffs' claims are typical of the claims of the Class. As detailed above, Plaintiffs received early-literacy instruction using Defendants' defective early-literacy products and suffered from literacy deficiencies as a result.

114.   **Adequacy(a)(4), 23(g)(1):** Plaintiffs will fairly and adequately represent the interests of the Class. They have retained skilled counsel with considerable experience in prosecuting and defending against class actions, including actions involving class-based consumer-protection, antitrust, products liability, constitutional, and civil rights claims.

115.   **Superiority—Fed.R.Civ.P. 23(b)(3):** Pursuing this lawsuit as a class action would be fair, efficient, and superior to other methods of adjudication.  Plaintiffs and members of the Class were damaged as a result of Defendants' misconduct.  Because of the size of the individual Class Members' claims, no Class Member could afford to seek legal redress for the wrongs identified in this Complaint.  Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses.  Further, individual litigation has the potential to result in inconsistent or contradictory judgments.  A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

116.    Plaintiffs and the Class do not anticipate any difficulty in the management of this litigation.

**CAUSES OF ACTION**

**COUNT I**
**UNFAIR AND DECEPTIVE ACTS AND PRACTICES**
**M.G.L. c. 93A, § 9**
**[By All Plaintiffs and the Putative Class Against All Defendants]**

117.    Plaintiffs, individually and on behalf of all others similarly situated, incorporate all preceding paragraphs as though set forth here.

118.    Through their conduct in creating, marketing, promoting, or profiting off their teaching materials and curricula in Massachusetts, Defendants engaged in unfair and deceptive practices in Massachusetts in the conduct of trade or commerce in violation of M.G.L. c. 93A, § 2, including:

    a.    Marketing, selling, or otherwise profiting from the sale of defective and deficient reading curricula, reading diagnostic tests, and teacher-training programs to Massachusetts elementary schools, school districts, and related entities;

    b.    Failing to provide adequate or complete disclosures and warnings regarding the deficient reading curricula and other training and reading products; and

    c.    Disseminating false, misleading, incomplete, and/or inadequate statements, instructions, training materials, and marketing materials regarding their reading and training products, including falsely claiming that their products were supported by credible evidence and research.

119.    Through their unfair and deceptive conduct, Defendants induced schools throughout Massachusetts to buy their defective Literacy Products, rather than those early-literacy products that provide adequate and scientifically sound early-literacy instruction. As a result,

Plaintiffs and the Class Members received reading instruction that Defendants knew or with the exercise of due care should have known was deficient.

120.    Upon information and belief, through their unfair and deceptive acts, Defendants' lifetime revenues from their direct and indirect sales to Massachusetts schools have exceeded many millions of dollars.

121.    Because of Defendants' unfair and deceptive acts, Plaintiffs and the Class Members suffered ascertainable injuries and losses in an amount to be proven at trial.

122.    Defendants knew or should have known that they were committing unfair and deceptive acts, in violation of M.G.L. c. 93A, § 2.

123.    On September 24, 2024, pursuant to M.G.L. c. 93A, § 9(3), Plaintiffs mailed or delivered to each Defendant a written demand for relief reasonably describing the unfair and deceptive acts and practices and injuries alleged in this Complaint.

124.    On October 23, 2024, Plaintiffs mailed or delivered to the Board of Trustees of Teachers College, Columbia University, an amended written demand for relief reasonably describing the unfair and deceptive acts and practices and injuries alleged in this Complaint.

125.    As of December 4, 2024, no Defendant tendered a written offer of settlement in response to Plaintiffs' written demands for relief.

**COUNT II**
**NEGLIGENCE**
**[By All Plaintiffs and the Putative Class Against All Defendants]**

126.    Plaintiffs, individually and on behalf of all others similarly situated, incorporate all preceding paragraphs as though set forth here.

127.    The information set forth in the Literacy Products was created for the guidance and benefit of students including Plaintiffs and the Class, and the schools that purchased the Literacy

Products contracted with Defendants to be the source of literacy curriculum for their teachers and, by extension, their students including Plaintiffs and the Class.

128.    Defendants have a duty to exercise reasonable care and competence in communicating information in their Literacy Products, and in marketing and selling their Literacy Products. This includes a duty not to cause foreseeable harm to others.

129.    Defendants' conduct described herein created an unreasonable risk of harm to Plaintiffs and the Class.

130.    Through their conduct, Defendants repeatedly breached their duties to exercise reasonable care or competence by falsely and deceptively marketing their products in the manner alleged above, including by:

a.    Minimizing the risks posed to children by literacy products that do not include adequate and scientifically sound phonics instruction;

b.    Exaggerating the purported benefits of literacy products that do not include adequate and scientifically sound phonics instruction;

c.    Failing to provide adequate or complete disclosures and warnings regarding the deficient reading curricula and other training and reading products; and

d.    Disseminating false, misleading, incomplete, and/or inadequate statements, instructions, training materials, and marketing materials regarding their reading and training products, including falsely claiming that their Literacy Products were supported by and grounded in credible evidence and research.

131.    Defendants' conduct in making these representations and choosing to omit clear warnings about their products' known deficiencies was at a minimum deceptive and unfair, if not willful, wanton, malicious, reckless, oppressive, and/or fraudulent.

132.    Through their negligence and negligent misrepresentations, Defendants directly or indirectly induced schools and school districts throughout Massachusetts to buy their defective Literacy Products. The foreseeable result of Defendants' misrepresentations was that Plaintiffs and the Class Members received deficient reading instruction.

133.    Defendants' breaches of their duty of care directly and proximately resulted in the injuries and damages alleged by Plaintiffs, both individually and on behalf of all others similarly situated.

134.    Plaintiffs suffered ascertainable injuries and losses resulting from Defendants' misrepresentations and omissions in an amount to be proven at trial.

**COUNT III**
**FALSE ADVERTISING**
**M.G.L. c. 266, § 91**
**[By All Plaintiffs and the Putative Class Against All Defendants]**

135.    Plaintiffs, individually and on behalf of all others similarly situated, incorporate all preceding paragraphs as though set forth here.

136.    Defendants did advertise, and continue to advertise, the Literacy Products using false representations in order to sell the Literacy Products, as described herein.

137.    Defendants' advertisements of the Literacy Products are deceptive or misleading within the meaning of M.G.L. c. 266, §91.

138.    Defendants' advertising of the Literacy Products is likely to deceive Class Members and the general public.

139.    Defendants knew or should have known that the false representations they made on their websites and marketing materials were deceptive and/or misleading in violation of M.G.L. c. 266, §91.

140.    Plaintiffs seek an Order of this Court enjoining Defendants from continuing to violate the Massachusetts false advertising law or violating it in the same fashion in the future as discussed herein, and a declaration that the false representations violate M.G.L. c. 266 § 91.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, hereby respectfully request that this Court certify the Class and enter judgment in their favor and against Defendants, awarding:

a.    Actual damages suffered as a result of the Class's exposure to Defendants' ineffective and harmful Literacy Products, as well as any other damages that were caused by Defendants' wrongdoing, in amounts to be determined at trial;

b.    Compensatory damages to redress the harms caused to and expenditures incurred by Plaintiffs and the Class Members because of Defendants' ineffective and harmful curricula, including the costs associated with any tutoring, supplemental reading materials, or other out-of-pocket costs, in amounts to be determined at trial;

c.    Punitive and treble damages;

d.    Injunctive relief, including, but not limited to, an order requiring Defendants to provide to Plaintiffs and the Class Members an early-literacy curriculum that sufficiently reflects and incorporates the science of reading free of charge; an order enjoining Defendants from continuing to violate the Massachusetts false advertising law or violating it in the same fashion in the future as discussed herein;

e.    an order declaring that the false representations violate M.G.L. c. 266 § 91;

f.    An award of reasonable attorneys' fees and expenses; and

g.    All other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs, individually and on behalf of all others similarly situated, hereby demand a

trial by jury on all issues so triable.


Dated: March 13, 2025                     Respectfully submitted,

                                          /s/ *Amelia Caramadre*
                                          Amelia Caramadre
                                          Attorney for Plaintiffs


Sarah Grady* (IL #6312933)                Janet Herold (BBO #632479)
Amelia Caramadre (BBO #710230)            Benjamin Elga (BBO #697933)
**KAPLAN & GRADY LLC**                    **JUSTICE CATALYST LAW**
2071 N. Southport Ave., Ste. 205          40 Rector St.
Chicago, IL 60614                         New York, NY 10006
(312) 852-2184                            (518) 732-6703
sarah@kaplangrady.com                     janet@justicecatalyst.org
amelia@kaplangrady.com                    belga@justicecatalyst.org


Charles J. LaDuca*                        Michael J. Flannery*
R. Michael Smith*                         **CUNEO GILBERT & LaDUCA, LLP**
Alexandra C. Warren*                      2 City Place Drive
**CUNEO GILBERT & LaDUCA, LLP**           Second Floor
2445 M Street, NW                         St. Lois, MO 63105
Suite 740                                 (202) 789-3960
Washington, DC 20037                      mflannery@cuneolaw.com
(202) 789-3960
charlesl@cuneolaw.com
mike@cuneolaw.com
awarren@cuneolaw.com


*Attorneys for Plaintiffs*
*(\*pro hac vice admission)*


36

<u>**CERTIFICATE OF SERVICE**</u>

I, Amelia Caramadre, hereby certify that on March 13, 2025, the foregoing Amended Complaint was electronically filed with the Clerk of the Court using the Court's electronic filing system, which will serve as notification of such filing to the email addresses of all counsel of record in this action.

<u>/s/ Amelia Caramadre</u>
Amelia Caramadre
Attorney for Plaintiffs