UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| S.C., by her parent and next friend KARRIE CONLEY; K.C., by her parent and next friend KARRIE CONLEY; and R.H., by his parent and next friend MICHELE HUDAK, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br>  v.<br><br>LUCY CALKINS; IRENE FOUNTAS; GAY SU PINNELL; RWPN, LLC, d/b/a THE READING & WRITING PROJECT AT MOSSFLOWER, LLC; TEACHERS COLLEGE, COLUMBIA UNIVERSITY; FOUNTAS AND PINNELL, LLC; GREENWOOD PUBLISHING GROUP, LLC, d/b/a HEINEMANN PUBLISHING; and HMH EDUCATION CO.,<br><br>        Defendants. | Case No. 1:25-cv-10007-RGS |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPAINT FOR FAILURE TO STATE A
<u>CLAIM AND TO ALTERNATIVELY STRIKE THE CLASS ALLEGATIONS</u>**

**TABLE          OF          CONTENTS**

**INTRODUCTION**................................................................................................ 1

**RELEVANT FACTUAL BACKGROUND** ............................................................ 1

**LEGAL STANDARD**......................................................................................... 7

**ARGUMENT** ..................................................................................................... 8

I.     PLAINTIFFS' CLAIMS ADDRESS DEFENDANTS' DECEPTIVE AND UNFAIR COURSE OF CONDUCT, NOT EDUCATIONAL MALPRACTICE ........................ 8

II.    PLAINTIFFS' ALLEGATIONS MEET THE REQUIREMENTS OF RULE 9(b) ...... 12

III.    PLAINTIFFS' CHAPTER 93A CLAIM IS ADEQUATELY PLED............................ 18

      A.     Defendants' Conduct Falls Squarely Within 93A's Definition of "Commerce".............................................................................. 19

      B.     Defendants' Conduct Was Unfair.............................................. 22

      C.     Defendants' Unsubstantiated Advertising Claims and Nondisclosure of Material Facts Constitute Deceptive Conduct........................... 25

IV.    PLAINTIFFS STATE CLAIMS FOR NEGLIGENT MISREPRESENTATION AND NEGLIGENCE ............................................................................................. 28

VI.    PLAINTIFFS HAVE NOT ASSERTED PRODUCTS LIABILITY CLAIMS AGAINST DEFENDANTS ........................................................................... 32

VII.   CLASS ALLEGATIONS............................................................................... 33

VIII.  PLAINTIFFS HAVE ADEQUATELY PLED THE INDIVIDUAL DEFENDANTS' MISCONDUCT ........................................................................................... 37

**CONCLUSION**.................................................................................................. 37

i

# TABLE OF AUTHORITIES

**Cases**

*A.C. by Waithe v. McKee*,
  23 F.4th 37 (1st Cir. 2022)..........................................................................................12

*Advance Dx, Inc. v. YourBio Health, Inc.*,
  753 F. Supp. 3d 53 (D. Mass. 2024).................................................................. 24, 27

*Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*,
  374 F.3d 23 (1st Cir. 2004)..........................................................................................13

*Aspinall v. Philip Morris Cos.*,
  442 Mass. 381, 813 N.E.2d 476 (2004) ....................................................................26

*Begelfer v. Najarian*,
  381 Mass. 177, 409 N.E.2d 167 (1980) ....................................................................20

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................................................7

*Berezin v. FCA US, LLC*,
  No. CV 21-10852-FDS, 2022 WL 488411 (D. Mass. Feb. 17, 2022).......................30

*Blue Cross and Blue Shield of North Carolina v. Rite Aid Corp.*,
  519 F. Supp. 3d 522 (D. Minn. 2021) .......................................................................18

*Braun v. Soldier of Fortune Magazine, Inc.*,
  968 F.2d 1110 (11th Cir. 1992)...................................................................................32

*Casavant v. Norwegian Cruise Line, Ltd.*,
  76 Mass.App.Ct. 73, 919 N.E.2d 165 (2009)............................................................26

*Ciardi v. F. Hoffmann-La Roche, Ltd.*,
  436 Mass. 53, 762 N.E.2d 303 (2002) .................................................................19, 28

*Clegg v. Butler*,
  424 Mass. 413 (1997)..................................................................................................21

*Cognitive Edge Pte Ltd. v. Code Genesys, LLC*,
No. 1:19-CV-12123-IT, 2021 WL 2829555 (D. Mass. Jan. 19, 2021).....................................23

*Cohen v. Brokers' Serv. Mktg. Grp. II, LLC*,
87 Mass. App. Ct. 1121 (2015)...........................................................................................21

*Cont'l Ins. Co. v. Bahnan*,
216 F.3d 150 (1st Cir. 2000)................................................................................................18

*Costa v. Dvinci Energy, Inc.*,
342 F.R.D. 38 (D. Mass. 2022)............................................................................................36

*Courtemanche v. Motorola Sols., Inc.*,
No. 4:24-CV-40030-MRG, 2025 WL 951401 (D. Mass. Mar. 28, 2025)...............................19

*Craig v. Everett M. Brook Co.*,
351 Mass. 497 (1967).........................................................................................................29

*Cristostomo v. New Balance Athletics, Inc.*,
647 F. Supp. 3d 1 (D. Mass. 2022)......................................................................................36

*Crommelin v. Takeda Pharms. U.S.A., Inc.*,
747 F. Supp. 3d 304 (D. Mass. 2024)..................................................................................33

*Crosby Legacy Company, LLC v. TechnipFMC PLC*,
2019 WL 5588993 (D. Mass. 2019).....................................................................................15

*Cumis Ins. Soc., Inc. v. BJ's Wholesale Club*,
No. 20051158J, 2008 WL 2345865 (Mass. Super. June 4, 2008)...................................28, 29

*Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*,
455 Mass. 458, 918 N.E.2d 36 (2009).............................................................................28, 29

*Day v. Fallon Cmty. Health Plan, Inc.*,
917 F. Supp. 72 (D. Mass. 1996)...........................................................................................8

*Douglas v. EF Inst. for Cultural Exch., Inc.*,
No. 20-CV-11740-DJC, 2023 WL 1993499, (D. Mass. Feb. 14, 2023)...........................35, 36

*Doyle v. Hasbro, Inc.*,
    103 F.3d 186 (1st Cir. 1996)................................................................................13

*Dumont v. Reily Foods Company*,
    934 F.3d 35 (1st Cir. 2019)........................................................................... 17, 18

*Durbeck v. Suffolk Univ.*,
    547 F. Supp. 3d 133 (D. Mass. 2021)............................................................ 9, 10

*Dushkin v. Desai*,
    18 F. Supp. 2d 117 (D. Mass. 1998)...................................................................21

*Ferring Pharms., Inc. v. Braintree Lab'ys, Inc.*,
    38 F. Supp. 3d 169 (D. Mass. 2014)...................................................................27

*Garcia v. Kusan, Inc.*,
    39 Mass. App. Ct. 322, 655 N.E.2d 1290 (1995)....................................... 32, 33

*García-Catalán v. United States*,
    734 F.3d 100 (1st Cir. 2013)................................................................................7

*Gary B. v. Whitmer*,
    957 F.3d 616 (6th Cir. 2020)........................................................................11, 12

*Grajales v. P.R. Ports Auth*,
    682 F. 3d 40 (1st Cir. 2012)................................................................................7

*Grant v. Chapman Univ.*,
    No. 30-2020-01146699-CU-BC-CXC, 2021 WL 684581 (Cal. Super. Ct. Jan. 22, 2021)..........9

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999)................................................................................8

*Green v. Sirchie Acquisition Co. LLC*,
    633 F. Supp. 3d 393 (D. Mass. 2022)................................................. 20, 24, 26, 27

*Hanberry v. Hearst Corp.*,
    81 Cal. Rptr. 519 (Cal. Ct. App. 1969)...............................................................31

*Hanna v. Williams*,
No. 1684CV0722BLS1, 2017 WL 2292756 (Mass. Super. Jan. 9, 2017) ............................... 21

*Heller Fin. v. Ins. Co. of N. Am.*,
410 Mass. 400, 573 N.E.2d 8 (1991) .................................................................................... 22

*In re Evenflo Co., Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*,
707 F. Supp. 3d 103 (D. Mass. 2023)................................................................................ 34, 36

*In re Suffolk Univ. Covid Refund Litig.*,
616 F. Supp. 3d 115 (D. Mass. 2022).................................................................................... 8

*In re Suffolk Univ. Covid Refund Litigation*,
2022 WL 2713732 (D. Mass. July 13, 2022) ........................................................................ 9

*Islam v. Option One Mortg. Corp.*,
432 F. Supp. 2d 181 (D. Mass. 2006).................................................................................... 30

*Kaufman v. CVS Caremark Corp.*,
836 F.3d 88 (1st Cir. 2016)........................................................................................ 12, 15, 16

*King v. Kayak Mfg. Corp.*,
182 W.Va. 276, 387 S.E.2d 511 (W. Va. 1989)..................................................................... 31

*Klairmont v. Gainsboro Restaurant, Inc.*,
465 Mass. 165, 987 N.E.2d 1247 (2013) ......................................................................... 25, 28

*Lee v. Conagra Brands, Inc.*,
958 F.3d 70 (1st Cir. 2020)............................................................................................... 25, 27

*Lines v. Stokes & Levin, Inc.*,
No. 071653, 2008 WL 2745286 (Mass. Super. July 6, 2008).................................................. 21

*Linkage Corp. v. Trs. of Bos. Univ.*,
425 Mass. 1, 679 N.E.2d 191 (1997) ............................................................................... 20, 23

*M. S. v. Amazon.com, Inc,*
No. 3:23-CV-0046, 2023 WL 8283642 (S.D.W. Va. Nov. 30, 2023)....................................... 31

*Maillet v. ATF-Davidson Co.*,
   407 Mass. 185 (1990)............................................................................21

*Maio v. TD Bank, N.A.*,
   No. 1:22-CV-10578-AK, 2023 WL 2465799 (D. Mass. Mar. 10, 2023) ...................................30

*Manning v. Bos. Med. Ctr. Corp.*,
   725 F.3d 34 (1st Cir. 2013)............................................................... 33, 34

*Mantha v. QuoteWizard.com, LLC*,
   347 F.R.D. 376 (D. Mass. 2024) ..............................................................35

*Martin v. Mead Johnson Nutrition Co.*,
   2010 WL 3928707 (D. Mass. 2010)......................................................17

*Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc*,
   552 F.3d 47 (1st Cir. 2009).......................................................................22

*McCormick v. Lischynsky*,
   No. 19-10433-FDS, 2019 WL 3429242 (D. Mass. July 30, 2019) ...........................30

*Mechs. Nat'l Bank of Worcester v. Killeen*,
   377 Mass. 100, 384 N.E.2d 1231 (1979) .....................................................22

*Moniz v. Bayer Corp.*,
   484 F. Supp. 2d 228 (D. Mass. 2007).......................................................19

*Munsell v. Colgate-Palmolive Co.*,
   463 F. Supp. 3d 43, 52-53 (D. Mass. 2020) ...................................... 15, 17

*Nestlenook, Inc. v. Atlantic Design Engineers*,
   17 Mass. L. Rptr. 25, 2003 WL 22670881 (Mass. Super. Ct. 2003).........................29

*Nota Const. Corp. v. Keyes Associates, Inc.*,
   45 Mass. App. Ct. 15, 694 N.E.2d 401 (1998).......................................................29

*Nycal Corp. v. KPMG Peat Marwick LLP*,
   426 Mass. 491, 688 N.E.2d 1368 (1998) .................................................29

*Nycal v. KPMG Peat Marwick, LLP,*
    426 Mass. 491 (1996)......................................................................................... 29

*O'Connell v. Hyatt Hotels of P.R.,*
    357 F.3d 152 (1st Cir.2004) ............................................................................. 37

*O'Hara v. Diageo-Guinness, USA, Inc.,*
    306 F. Supp. 3d 441(D. Mass. 2018)............................................................... 35

*Obesity Research Inst., LLC v. Fiber Research Int'l, LLC,*
    165 F. Supp. 3d 937 (S.D. Cal. 2016) ............................................................. 16

*Peter W. v. San Francisco Unified Sch. Dist.,*
    60 Cal. App. 3d 814 (1976)...............................................................................11

*Planned Parenthood Fed'n of Am., Inc. v. Problem Pregnancy of Worcester, Inc.,*
    398 Mass. 480, N.E.2d 1044 (1986) ................................................................ 21

*PMP Assocs., Inc. v. Globe Newspaper Co.,*
    366 Mass. 593, 321 N.E.2d 915 (1975) ........................................................... 23

*Poznik v. Massachusetts Med. Prof'l Ins. Ass'n,*
    417 Mass. 48, 628 N.E.2d 1 (1994) ................................................................. 21

*Rafferty v. Merck & Co., Inc.,*
    479 Mass. 141, 161, 92 N.E.3d 1205 (2018) .............................................. 19, 22

*Ross v. Creighton Univ.,*
    957 F.2d 410 (7th Cir. 1992) ........................................................................... 10

*Royal Park Invs. SA/NV v. Bank of New York Mellon*, No. 1:14-CV-6502-GHW, 2019 WL
    652841 (S.D.N.Y. Feb. 15, 2019)..................................................................... 35

*Ryan v. Greif, Inc.,*
    708 F. Supp. 3d 148 (D. Mass. 2023)............................................................... 19

*Schatz v. Republican State Leadership Comm.,*
    669 F.3d 50 (1st Cir. 2012)................................................................................. 7

*Schubach v. Household Fin. Corp.*,
  375 Mass. 133 (Mass. 1978) ..................................................................................23

*Schuh v. HCA Holdings, Inc.*,
  No. 3:11-01033, 2014 WL 4716231 (M.D. Tenn. Sept. 22, 2014)...........................35

*Schuster v. Wynn Ma, LLC*,
  118 F.4th 30 (1st Cir. 2024)....................................................................................26

*Smith v. Ohio State Univ.*,
  No. 2020-00321JD, 2020 WL 5694224 (Ohio Ct. Cl. Sept. 09, 2020)........................9

*Stone/Congress v. Town of Andover*,
  6 Mass. L. Rptr. 330, 1997 WL 11737 (Mass. Super. Ct. 1997) ...............................29

*Tassinari v. Salvation Army Nat'l Corp.*,
  610 F. Supp. 3d 343 (D. Mass. 2022).......................................................................36

*Tomasella v. Nestle USA, Inc.*,
  962 F.3d 60 (1st Cir. 2020)................................................................................ 23, 26

*Urella v. Verizon New England Inc.*,
  No. CV 22-11606-FDS, 2024 WL 1075300 (D. Mass. Mar. 12, 2024) ............................ 35, 36

*Walgreen Co. v. Haseotes*,
  No. 4:24-CV-10151-MRG, 2025 WL 991312 (D. Mass. Mar. 31, 2025) ........................... 8, 17

*White v. Fessenden Sch.*,
  Civil Action No. 07-10908-JLT, 2007 WL 9798267 (D. Mass. July 17, 2007) .........................9

*Wright v. Medtronic, Inc.*,
  81 F. Supp. 3d 600 (W.D. Mich. 2015) ...................................................................16

*Zagoria*,
  2021 WL 1026511 ............................................................................................ 9, 10

*Zhou v. Desktop Metal, Inc.*,
  120 F. 4th 278 (1st Cir. 2024) ..................................................................................7

**Statutes**

G.L. c. 93A, § 1 (b ) .................................................................................................. 30

M.G.L.A. c. 93A, § 2(a) ........................................................................................... 28

M.G.L.A. c. 93A, § 9(1) ...................................................................................... 28, 29

Restatement (Second) of Torts § 302 (1965) ............................................................ 41

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 16

Fed. R. Civ. P. 9(b) .................................................................................................. 21

Fed.R.Civ.P. 15(a)(2) ............................................................................................... 46

## INTRODUCTION

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants Lucy Calkins, Irene Fountas, Gay Su Pinnell, RWPN, LLC, d/b/a The Reading & Writing Project At Mossflower, LLC, Fountas and Pinnell, LLC, Greenwood Publishing Group, LLC, d/b/a Heinemann Publishing, and HMH Education Company's ("Defendants") Motion to Dismiss The Amended Complaint for Failure to State a Claim and to Alternatively Strike the Class Allegations (Dkt. 52) (the "Motion").

Plaintiffs initiated this action to remedy Defendants' deceptive and fraudulent marketing and sale of early literacy products. Research confirms that systemic and explicit phonics is a necessary element of early literacy instruction. Nevertheless, Defendants created, published, and marketed literacy products that excluded phonics and, importantly, falsely claimed that those products were research-based while ignoring scientific research to the contrary.

Defendants' arguments in favor of dismissal misapply or ignore the applicable standards of review and governing law and improperly misconstrue the allegations in Defendants' favor. Defendants' argument in favor of striking the class allegations is likewise without merit. The Motion should be denied.

## RELEVANT FACTUAL BACKGROUND

Experts and researchers have long agreed that phonics is a necessary element to effective early-literacy instruction. Am. Compl. (Dkt. 47) ¶ 38.

In 1997, Congress convened a National Reading Panel (the "Panel") to study American early-literacy instruction. Am. Compl. ¶ 33. The Panel published its findings in 2000. Am. Compl. ¶ 33. Relying on the robust body of research just discussed, the Panel concluded that "teaching children to manipulate phonemes in words was highly effective under a variety of teaching conditions with a variety of learners across a range of grade and age levels and that teaching

1

phonemic awareness to children significantly improves their reading more than instruction that lacks any attention to [phonemic awareness]." Am. Compl. ¶ 33.

According to the Panel report, "[t]he meta-analysis indicated that systemic phonics instruction enhances children's success in learning to read and that systemic phonics instruction is significantly more effective than instruction that teaches little or no phonics… These facts and findings provide converging evidence that **explicit, systemic phonics instruction is a valuable and essential part of a successful classroom reading program**… **[S]ystemic phonics instruction is… a necessary component… of a total reading program…**"[1] Am. Compl. ¶ 35. Soon after the Panel released its report, other English-speaking countries, including Australia (2005) and the United Kingdom (2006), came to the same conclusions. Am. Compl. ¶ 36. And many other studies subsequently replicated or confirmed the same findings, including research showing a neurological basis for the importance of letter-sound relationships.  Am. Compl. ¶ 36.

Defendants—the creators, publishers, and promoters of reading curricula and related services marketed under the Fountas & Pinnell, *Units of Study*, Teachers College Reading & Writing Project, or Reading & Writing Project at Mossflower trade names (the "Literacy Products")—peddled a raft of products and curricula that sought to diminish and even exclude systematic and daily phonics instruction.  Am. Compl. ¶ 3.

Defendant, Calkins, is the creator of the *Units of Study* curriculum and founded Mossflower where she and her team author *Units of Study*.  Am. Compl. ¶¶ 9, 16, 18. *Units of Study* can be

---

[1] The Report contrasts systematic phonics instruction with incidental phonics instruction: "The hallmark of a systematic phonics approach or program is that a sequential set of phonics elements is delineated and these elements are taught along a dimension of explicitness depending on the type of phonics method employed. Conversely, with incidental phonics instruction, the teacher does not follow a planned sequence of phonics elements to guide instruction but highlights particular elements opportunistically when they appear in text."

purchased through Mossflower's website, which links to the Heinemann website, where institutional purchasers are able to locate their local Heinemann Sales Representative and purchase materials online.  Am. Compl. ¶ 19.

Defendants, Fountas and Pinnell, are the creators of the *Fountas & Pinnell Classroom* curriculum, *Leveled Learning Intervention*, and *Fountas & Pinnell Benchmark Assessment System* (the "F&P Literacy Products").  Am. Compl.  ¶¶ 20-21.  F&P Literacy Products can be purchased on the F&P LLC website, which links to the Heinemann website that allows institutional purchasers to find their local Heinemann Sales Representative or to purchases materials online. Am. Compl.  ¶ 22.

Defendant, Heinemann, is a wholly owned subsidiary of Defendant HMH and both entities publish, market, and sell educational materials including the Literacy Products.  Am. Compl. ¶¶ 23-24, 39, 40.

As part of a concerted effort to increase sales of the Literacy Products, all Defendants represented on their websites and publications that the Literacy Products were "research-backed," "research-based," "data-based," based on "gold-standard" research, and fit for the purpose of providing early literacy instruction (the "False Representations").  Am. Compl. ¶¶ 4, 48.  But these representations are false.  Defendants knew or should have known but failed to disclose that, due to the failure to include explicit and systematic phonics instruction, the Literacy Products were not fit to provide early-literacy instruction and not backed by research.  Am. Compl. ¶¶ 5, 49 ("the undisputed scientific consensus—at least since 2000 when the Panel issued its findings—has been that systematic phonics instruction is a necessary element of early-literacy education and, by extension, that the failure to include systematic phonics instruction in early-literacy curricula amounts to deficient early-literacy education").

Defendants ignored the expert and research consensus about the essential role systematic phonics instruction plays in successful literacy education and created, marketed, published, and sold the early-childhood Literacy Products that pay lip service to phonics at best and ignore phonics completely at worst.  Am. Compl. ¶¶ 38, 42 (the Literacy Products "all omitted systematic structured phonics instruction"), ¶ 45 ("none of [the Literacy Products] include systematic instruction or practice with the phonetic tools that undisputed research long has shown allows children to learn to read more effectively"); ¶ 46 (none of the Literacy Products include systemic instruction or practice with phonetic tools that undisputed research long has shown allows children to learn to read more effectively); ¶ 49 (the undisputed scientific consensus has been that systematic phonics instruction is a necessary element of early-literacy education and, by extension, that the failure to include systematic phonics instruction in early-literacy curricula amounts to deficient early-literacy education); ¶ 63 (Seven leading early-literacy scholars, developmental psychologists, and neuroscientists assembled by the non-profit Student Achievement Partners issued a report concluding that *Units of Study* did not devote enough time to phonics instruction); ¶ 67 (EdReports concluded that *Units of Study* "[m]aterials do not include systematic and explicit instruction in all foundational skills standards to provide students with opportunities to progress towards reading proficiency." Further criticisms included the lack of: (a) a "research-based explanation for the order of phonological awareness and phonics instruction," of "cohesive and sequential scope and sequence," and (b) "systematic and explicit instruction in all foundational skills standards to provide students with opportunities to progress towards reading proficiency."). Am. Compl. ¶ 67.

The few studies that Defendants have cited in support of their approaches are unreliable, methodologically flawed, and lack sound theoretical or empirical foundations.  Am. Compl. ¶ 5.

Indeed, upon information and belief, Defendants conducted no rigorous research and collected no data (as opposed to anecdotes from adherents) to support their methodologies until the early 2020s. Am. Compl. ¶ 55. In January 2021, the American Institutes for Research confirmed that the products sold by defendant Teachers College, Columbia University—where Defendant, Calkins, developed *Units of Study*—had "*never been subjected to a rigorous evaluation* in which the reading achievement of schools implementing [Teachers College] is compared with that of non-[Teachers College] schools." Am. Compl. ¶¶ 41-42, 55.

Defendants have pointed to the American Institutes for Research study—and a small number of other, mostly recent studies (some funded by Heinemann)—as proof of the efficacy of their methods, even though all these studies suffer from glaring methodological, theoretical, and other flaws that wholly undermine that conclusion. Am. Compl. ¶ 55. The studies on which Defendants rely are not sufficiently reliable to permit one to conclude with reasonable certainty that their Literacy Products are effective. Am. Compl. ¶ 55. And given the significant limitations and marginal results of these studies, Defendants' reliance on these studies as support for the claim that the Literacy Products are science-backed is misleading. Am. Compl. ¶ 55.

Defendants intentionally engaged in this unfair, deceptive, and fraudulent course of conduct as part of a continued effort to increase sales of the Literacy Products to schools and school districts, including the public schools in Acton-Boxborough, Sandwich, and Ashland Massachusetts that Plaintiffs, S.C., K.C., and R.H., attended. Am. Compl. ¶ 56.

The schools and school districts that purchased the Literacy Products—including those that Plaintiffs attended—did so in reliance upon Defendants' misrepresentations that their Literacy Products were science-backed and entered into contracts to purchase the Literacy Products to teach students, including Plaintiffs, to read. Am. Compl. ¶ 57. Defendants owed a duty of good faith

and fair dealing to the schools and school districts that purchased the Literacy Products and to Plaintiffs whom Defendants obviously had reason to know would be taught using their Literacy Products. *Id*. By engaging in their fraudulent and unfair course of conduct as described herein, Defendants breached their duty of good faith and fair dealing not only to the schools and school districts, but also to the students who attended those schools who are third party beneficiaries of the contracts their schools entered into with Defendants. *Id*.

Defendants earned millions of dollars selling their defective Literacy Products to schools and teachers, *see* Am. Compl. ¶ 88, but the consequences for Plaintiffs and other children have been catastrophic. Am. Compl. ¶ 89. Because Defendants' curricula do not contain the building blocks for teaching effective early-childhood literacy, huge numbers of children, including countless children in the Commonwealth, have suffered devastating setbacks in their educational development. Am. Compl. ¶ 89.

Karrie Conley's child, S.C., was taught through Heinemann's *Units of Study*, and then received ineffective assistance through Heinemann's *Leveled Literacy Intervention,* resulting in her reading delays going unnoticed for years. Am. Compl. ¶ 103. Without the instruction necessary to secure reading proficiency by third grade, S.C. so struggled with her word-based math curriculum that Karrie needed to transfer her to a private school that could redress her literacy deficiencies and attendant educational delays. *Id*. And even after transferring, S.C. still required year-round private tutoring from fourth through seventh grades to repair the damage done. *Id*.

Another of Karrie's children, K.C., was exposed to *Units of Study* and *Leveled Literacy Intervention* from kindergarten through second grade, when her parents detected that she also appeared not to be developing the necessary and appropriate literacy decoding skills. Am. Compl.

6

¶ 104.  Realizing that time was of the essence, Karrie transferred K.C. to a private school to secure access to reading programs and intensive tutoring with systematic phonics instruction. *Id.*

Sending S.C. and K.C. to private school and securing literacy tutoring cost more than twice what Karrie paid to send another of her children to college.  Am. Compl. ¶ 105.

Michele Hudak's minor child, R.H., was taught using *Units of Study* and *Leveled Literacy Intervention* and received defective assessments through the *Fountas & Pinnell Benchmark Assessment System*. Am. Compl. ¶ 106.  Despite being unable to read, R.H.'s BAS results suggested that he "read" at grade level from kindergarten through fourth grade solely because he could successfully guess words from pictures. *Id.*  When presented with chapter books in fourth grade, it became apparent R.H. was far behind many of his peers—but the damage already had been done. *Id.*  Like Karrie, Michelle had to secure private literacy tutoring to address and remediate R.H.'s reading deficits. Am. Compl. ¶ 107.

## LEGAL STANDARD

A complaint must allege facts that "plausibly narrate a claim for relief" to withstand a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).  *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted).  The Court must "accept well-pleaded factual allegations in [the Plaintiffs'] complaint as true and view all reasonable inferences in [its] favor," *Zhou v. Desktop Metal, Inc.*, 120 F. 4th 278, 287 (1st Cir. 2024), to determine whether the claim is "plausible on its face." *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013). "To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability." *Grajales v. P.R. Ports* Auth, 682 F. 3d 40, 44-45 (1st Cir. 2012); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (plausibility standard is not a probability standard but requires more than a sheer possibility that defendant acted unlawfully). The court "neither weighs the

evidence nor rules on the merits because the issue is not whether plaintiffs will ultimately prevail, but whether they are entitled to offer evidence to support their claims." *Day v. Fallon Cmty. Health Plan, Inc*., 917 F. Supp. 72, 75 (D. Mass. 1996).

Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." *Greebel v. FTP Software, Inc*., 194 F.3d 185, 193 (1st Cir. 1999). "Thus, Rule 9(b) requires an averment of the who, what, where, and when of the allegedly false or fraudulent representation. The other elements of fraud, such as intent and knowledge, may be averred in general terms." *Walgreen Co. v. Haseotes*, No. 4:24-CV-10151-MRG, 2025 WL 991312, at *5 (D. Mass. Mar. 31, 2025) (internal quotation marks and citations omitted).

## ARGUMENT

### I.    PLAINTIFFS' CLAIMS ADDRESS DEFENDANTS' DECEPTIVE AND UNFAIR COURSE OF CONDUCT, NOT EDUCATIONAL MALPRACTICE

Contrary to Defendants' characterizations, this case constitutes much more than a debate about educational theories. Defendants take a broad brush to the Amended Complaint, fixating on the fact that the underlying facts take place in the context of early literacy instruction, and ignoring that at bottom, this case concerns lies that Defendants told to make a profit. Defendants would have this Court hold that so long as the subject matter of a misrepresentation concerns the purview of education, no liability can attach to the bad actors. Defendants are wrong and the cases they cite do not stand for this proposition.

For example, the plaintiffs in *In re Suffolk Univ. Covid Refund Litig.*, 616 F. Supp. 3d 115, 116 (D. Mass. 2022) (cited by Defendants), sued Suffolk University claiming breach of an implied contract and unjust enrichment due to Suffolk's transition to a fully online program in light of the

COVID-19 Pandemic. The case does not address the proposition that Defendants urge this Court to adopt—that "claims based on alleged lack of educational quality" (Defendants' Memorandum of Law In Support of the Motion ("Defs.' Brf.") at 8) are not viable.

Rather, the court was considering the calculation of damages on a motion for summary judgment on breach of contract and unjust enrichment claims determined that:

> Plaintiffs' tuition-based claims are *only allowed to proceed to damages calculation* insofar as the Plaintiffs can demonstrate at trial either: (1) that *Suffolk* has a particular method for calculating the cost difference between its online and in-person programs and apply that method of calculation to the in-person undergraduate program; or (2) that a consistent cost differential -- either across school years or across programs -- exists between the online and in-person versions of *Suffolk's* other educational programs (such as the MBA) and apply that differential to the in-person undergraduate program."

*In re Suffolk Univ. Covid Refund Litigation*, 2022 WL 2713732, at *2 (D. Mass. July 13, 2022) (emphasis in original). In reaching this conclusion the court cited *Durbeck v. Suffolk Univ.*, 547 F. Supp. 3d 133, 139 (D. Mass. 2021) for the proposition that calculating other damages "would run afoul of the educational malpractice bar." *Id.* But Defendants do not explicitly contend that Plaintiffs have asserted an improper educational malpractice claim. Nor could they: the Amended Complaint does not include such a cause of action or ever use this terminology.

Moreover, the *Durbeck* court confirmed the accuracy of Plaintiffs' position that allegations that might be labeled as "educational malpractice" are not the death knell of a lawsuit.

> It is axiomatic that "the educational malpractice doctrine does not foreclose all lawsuits by students." *Zagoria*, 2021 WL 1026511, at *3, *see Grant v. Chapman Univ.*, No. 30-2020-01146699-CU-BC-CXC, 2021 WL 684581, at *3 (Cal. Super. Ct. Jan. 22, 2021) (in COVID-19 tuition refund dispute, stating that "just because a claim touches on educational issues does not mean it sounds in 'educational malpractice' "); *Smith v. Ohio State Univ.*, No. 2020-00321JD, 2020 WL 5694224, at *2 (Ohio Ct. Cl. Sept. 09, 2020) (in COVID-19 tuition refund dispute, stating that "[t]he mere mention of possible consequences to plaintiff's educational or professional future does not render plaintiff's complaint a claim for educational malpractice"); *e.g., White v. Fessenden Sch.*, Civil Action No. 07-10908-JLT, 2007 WL 9798267, at *3 (D. Mass. July 17, 2007) (Tauro, J.) (rejecting defendant-

school's characterization of student's claims as alleging "educational malpractice"). Breach of contract claims, for instance, do not allege educational malpractice where the "essence" of the plaintiff's claims is not "that the institution failed to perform adequately a promised educational service, but rather that it failed to perform that service at all*." Ross v. Creighton Univ.*, 957 F.2d 410, 417 (7th Cir. 1992); *see Zagoria*, 2021 WL 1026511, at *3 ("When the essence of the complaint moves beyond the effectiveness of education and into more specific promises for specified services, a student may be able to sue for breach of contract.").

*Durbeck*, 547 F. Supp. 3d at 139.

Unconvinced by the defendant's arguments that the plaintiffs' "claims [were]… merely cloaked with creative labeling," the *Durbeck* court noted that "the essence of this action is not that Suffolk failed to perform adequately a promised educational service when it delivered a virtual experience, but rather that Suffolk failed to deliver the promised in-person experience entirely in the second half of the spring 2020 semester." *Id*. at 141(internal quotation marks and citations omitted). And, ultimately, the court went on to deny the defendant's motions to dismiss in its entirety. *Id*. at 150. Here, the "essence" of the action is that Defendants misrepresented that the Literacy Products were research-backed to increase their profits. Defendants' attempts to recharacterize the core of Plaintiffs' allegations should be rejected.

Correspondingly, Plaintiffs do not seek this Court's intervention "to resolve questions about a school's choice of books," or to resolve a debate regarding differing educational theories. *See* Defs. Brf. at 12-13 (internal quotation marks omitted). Rather, Plaintiffs seek to hold Defendants' accountable for their purposeful misrepresentations regarding the scientific backing of their Literacy Products, which the Amended Complaint alleges were made as part of a concerted effort to increase sales of those Products. Am. Compl. ¶¶ 4-5. Thus, Defendants' briefing related to which branches of government have oversight over education and the standard of care as it relates to educational malpractice is not pertinent. (Defs.' Brf. at 10-13.)

Relying on *Peter W. v. San Francisco Unified Sch. Dist.*, 60 Cal. App. 3d 814, 824 (1976), a California case, Defendants next contend that Plaintiffs cannot establish causation on an educational-quality based claim. (Defs.' Brf. at 13-14). In *Peter W.*, the question before the court of appeal was "whether a person who claims to have been inadequately educated, while a student in a public school system, may state a cause of action in tort against the public authorities who operate and administer the system." The Court held that he may not. *Id.*, 60 Cal. App. 3d at 817. In addition to the fact that *Peter W.* constitutes non-binding out of state authority, its discussion of causation that Defendants cite is not applicable here. The issue primary issue in this case concerns Defendants' False Representations; the primary issue in *Peter W.* concerned negligent educational malfeasance in the classroom and the duty of care to be imposed (or, not imposed) on the "persons and agencies who administer the academic phases of the public educational process." *Peter W.*, 60 Cal. App. 3d at 825.[2]

The Court should find that Plaintiffs' injuries connected to lack of literacy skills are cognizable. For instance, in *Gary B. v. Whitmer*, 957 F.3d 616, 648-649 (6th Cir. 2020), *reh'g en banc granted, opinion vacated*, 958 F.3d 1216 (6th Cir. 2020), a panel majority of the Sixth Circuit held that the Fourteenth Amendment's Due Process Clause provided students with a fundamental right to a "basic minimum education – meaning one that plausibly provides access to literacy." The court's rationale rested on the proposition that the role of basic literacy education within the broader constitutional framework suggested access to literacy was essential to the exercise of other fundamental rights and the concept of ordered liberty.

---

[2] Significantly, the *Peter W.* court acknowledged that while there was no cause of action for negligence based on the misrepresentations alleged, there was a possibility of stating a cause of action for intentional misrepresentation. *Id.*, 60 Cal. App. 3d at 827.

11

The First Circuit in *A.C. by Waithe v. McKee*, 23 F.4th 37, 45 (1st Cir. 2022), distinguished the facts before it to those *Gary B.*, when it held that adequate civics education in public schools was not a fundamental right:

> [T]he Gary B. plaintiffs alleged a total deprivation of a minimally adequate education. The Gary B. plaintiffs also cited data that showed "a zero or near-zero percentage of subject-matter proficiency among students at their schools," which was alone "not enough to state a claim, because the right to a basic minimum education cannot guarantee a specific educational outcome," but "support[ed] the inference that Plaintiffs' schools are woefully insufficient, especially when combined with qualitative descriptions of their classes' literacy shortcomings." *Id*. at 661.
>
> As described above, the complaint here fails to allege a total deprivation of a minimally adequate education (as opposed to specific subject-matter inclusion).

*A.C. by Waithe*, 23 F.4th at 45 (holding that Rhode Island's approach to civics education in public schools satisfied rational basis review). Nowhere did the court disagree with the Sixth Circuit's holding in *Gary B.*, the reasoning of which applies with equal force under the circumstances of this case.

Finally, and to reiterate, this Court is not being asked to "police the marketplace of ideas" and "tell teachers what and how to teach." (Defs.' Brf. at 17). The claims at issue here are not against schools and their resolution would have no impact on what schools or teachers in this Commonwealth do or do not do. Rather, a finding of liability against Defendants would ensure that they take responsibility for their misrepresentations and no longer misrepresent that the Literacy Products are science backed. They are not. At least since 1997, "all credible education and literacy research shows that daily phonics instruction is necessary for literacy success. Am. Compl. ¶ 3.

## II.    PLAINTIFFS' ALLEGATIONS MEET THE REQUIREMENTS OF RULE 9(b)

Under the heightened pleading requirement of Fed. R. Civ. P. 9(b), a complaint alleging fraud must state "the who, what, where, and when" of the alleged deception. *Kaufman v. CVS*

*Caremark Corp*., 836 F.3d 88, 91 (1st Cir. 2016) (quoting *Alternative Sys. Concepts, Inc. v. Synopsys, Inc*., 374 F.3d 23, 29 (1st Cir. 2004)); *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996) (Rule 9(b) "requires specification of the time, place, and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred") (citation omitted). Here, Plaintiffs have alleged the time, place, and content of Defendants' False Representations and omissions, easily satisfying the pleading requirements.

Heinmann's website included numerous examples of the False Representations regarding *Units of Study*, all detailed in the Amended Complaint. Am. Compl. ¶ 50 ("data-based", "research-based", "ideas" were "built… off of established new research").

So did the *Units of Study* website. Am. Compl. ¶ 51 ("Based on 30 years of intensive research, testing, and experience… [and] offer[ing] world-class-standards-aligned reading curriculum"; "refined over decades of research and piloting"; "[w]orkshops are… like… a researcher's laboratory"; "Drawing on learning gleaned from decades of research").

The Heinmann website also contained False Representations regarding the F&P Literacy Products. Am. Compl. ¶ 53 ("Fountas and Pinnell share a long history of writing books and materials that are research-based… [T]hey are committed to the important role of research in the development and ongoing evaluation of all of their reading, writing, phonics, and classroom resources.").

Likewise, Fountas and Pinnell made numerous misrepresentations regarding *Fountas & Pinnell Classroom* and *Fountas & Pinnell Leveled Literacy Intervention*. Am. Compl. ¶ 52 ("Fountas and Pinnell share a long history of writing books and materials that are research-based and practical for teachers to use. As a result they are committed to the important role of research in the development and ongoing evaluation of all of their reading, writing, phonics and classroom resources."; website page providing tabs for research including Fountas & Pinnell Classroom

Research, Leveled literacy Intervention Research, Benchmark Assessment System Research, Phonics, Spelling and Word Study System Research; Fountas and Pinell wrote in a November 2015 article that the F&P Literacy Products "are the result of over two decades of our research and practical work with teachers… In developing [Leveled Literacy Intervention]… we designed a researched-based framework for intervention lessons…"; In a 2010 article they authored for Scholastic entitled "Research Base for Guided Reading as an Instructional Approach", Fountas and Pinell wrote about their guided reading program and described the "research base… components of reading instruction."; on October 27, 2022, Fountas and Pinell published a blog post titled "Get the Facts: Responding to Misinformation About Fountas and Pinnell Literacy" where they doubled down on their false claims regarding the "research that proves the efficacy and value of [their]work."; "there is a volume of research that proves the efficacy and value of that work"; Fountas & Pinnell Literacy products "have been proven effective through independent studies, including a gold standard study"; "has demonstrated statistically significant positive effects… with a 'proven effective' rating").

All of the above representations are false because phonics is a necessary element of effective early-literacy instruction, *see* Am. Compl. ¶¶ 33-37, the Literacy Products fail to include explicit and systematic phonics instruction, Am. Compl. ¶ 5, and in truth, "Defendants conducted no rigorous research and collected no data (as opposed to anecdotes from adherents) to support their methodologies until the early 2020s." Am. Compl. ¶ 54. And, on the same websites on which Defendants made their False Representations, they failed to disclose the flaws in the Literacy Products—that they do not actually contain phonics instruction and were not subject to adequate testing—even though they knew or should have known that their curricula ran counter to the

scientific consensus among educators, educational psychologists, and other experts.  Am. Compl. ¶¶ 5, 72.

These allegations specify *the Who?* –  Defendants Calkins, Fountas, Pinnell, Mossflower, F&P LLC, Heinemann, and HMH; *the What?* – the False Representations and the omissions that in fact the Literacy Materials do not include phonics instruction and were not based on valid scientific data; *the Where?* – on their websites and within publications as set forth above; and *the When?* – during the time that Defendants' websites displayed the misrepresentations and in Defendants' publications.  *See e.g. Kaufman v. CVS Caremark Corporation*, 836 F.3d 88 (1st Cir. 2016) (consumer's allegations regarding retailer's alleged deception met particularity requirement for pleading fraud: that supplement supported "heart health;" retailer was the "who," the heart health statements were the "what," the label was the "where," and the occasion on which consumer purchased the supplement was the "when"); *Munsell v. Colgate-Palmolive Co.*, 463 F. Supp. 3d 43, 52-53 (D. Mass. 2020) (although a consumer did not describe each kind of personal care product they purchased or attach particular dates to their purchases, they did contend that they were regularly misled into purchasing the products advertised as "natural"); *Crosby Legacy Company, LLC v. TechnipFMC PLC*, 2019 WL 5588993, *12 (D. Mass. 2019)(a consultant alleged the time period that a company made the purportedly false representations, the content of those representations, and why they were alleged to be false, i.e., because the company had no intention of executing a written contract with the consultant).

Defendants' argument that Plaintiffs' allegations are insufficient under Rule 9(b) rests on the fact that Defendants' websites, in addition to including the False Representations, contain links to the data reports and case studies upon which Defendants' purport to rely for the proposition that the Literacy Products are science backed. (Def.s' Brf. at 16).  Defendants would have the Court

ignore Plaintiffs' allegations that in truth Defendants did not conduct any rigorous research or

collect any data to support their methodologies until the early 2020s, Am. Compl. ¶ 55, and that

given the significant limitations and marginal results of these studies, Defendants' reliance on these

studies as support for the claim that the Literacy Products are science-backed is misleading. Am.

Compl. ¶ 56. But these allegations are sufficient for the purpose of deciding a motion to dismiss.

For example, in *Kaufman v. CVS Caremark Corp.*, 836 F.3d 88, 94 (1st Cir. 2016), the First

Circuit reversed the lower court's dismissal of a complaint for failure to state a claim, holding that

the plaintiff-consumer had adequately alleged that the defendant-retailer did not meet labeling

requirements. Notably, the First Circuit stated that the plaintiff's "express allegation that there are

no 'scientifically valid studies' substantiating CVS's heart health statements fairly implies that

CVS has no competent and reliable evidence to support its heart health statements." *Id.*, 836 F.3d

at 93.[3] Certainly, Plaintiffs' allegations here meet this threshold. *See also Obesity Research Inst.,

LLC v. Fiber Research Int'l, LLC*, 165 F. Supp. 3d 937, 950 (S.D. Cal. 2016) (holding that

counterclaim plaintiff had adequately alleged falsity: "Fiber Research alleges that Lipozene

specifically uses the Propol research studies to bolster its claims, without justification… [and] the

type of purchaser… is not likely to have the resources to analyze whether the content of the

supplements are as represented or not"); *Wright v. Medtronic, Inc.*, 81 F. Supp. 3d 600, 616 (W.D.

Mich. 2015) (complaint satisfied requirements of Rule 9(b) where it alleged that the defendant

---

[3] The First Circuit went on to consider studies referenced in the complaint that the defendant claimed demonstrated that its claims were "scientific fact", but only "for [the] limited purpose… [of determining whether] the studies on their face render implausible [the plaintiff's] claim that there exist no scientifically valid studies establishing that CVS's heart health statements are truthful and not misleading" and concluded that they did not. *Id.*, 836 F.3d at 94. Accordingly, the First Circuit reversed the dismissal of the plaintiff's claim, holding that the plaintiff adequately pled that CVS's claims were misleading. *Id.*, 836 F.3d at 96.

sponsored medical literature, conferences, and statements by sales representatives to persuade physicians to put device to dangerous off-label uses, at the same time misrepresenting, downplaying and/or falsifying the seriousness of adverse events resulting from such uses).

"The purpose of Rule 9(b)'s heightened pleading standard is to put the opposing party on notice and enable them to prepare meaningful responses." *Walgreen Co. v. Haseotes*, No. 4:24-CV-10151-MRG, 2025 WL 991312, at *5 (D. Mass. Mar. 31, 2025) (internal quotation marks and citations omitted) (denying motion to dismiss fraud claim). The allegations set forth in the Amended Complaint are specific and provide Defendants with the information necessary to allow them to respond.

Put simply, Plaintiffs allege that Defendants sold Literacy Products that failed to include systemic phonics instruction, that for decades the scientific consensus has been that phonics is a necessary element of adequate early-literacy instruction, that Defendants knew this but nevertheless misrepresented that their Literacy Products are science-backed. These allegations meet the heightened pleading requirements of Rule 9(b). *See Martin v. Mead Johnson Nutrition Co.*, 2010 WL 3928707 (D. Mass. 2010) (pleading requirements met even though consumer did not specifically allege dates of challenged advertisements where "the Plaintiff included with her complaint dated copies of the print advertisements, direct mailing and information on the Mead Johnson website"); *Dumont v. Reily Foods Company*, 934 F.3d 35, 38-40 (1st Cir. 2019) (a customer pled that labeling of "Hazelnut Crme" coffee, which did not actually contain any hazelnut, was a deceptive practice: the product's seller and their parent company were the "who," the "Hazelnut Crme" statement was the "what," the label was the "where," and the occasion on which the customer purchased the coffee was the "when."); *Munsell v. Colgate-Palmolive Co.*, 463 F. Supp. 3d 43, 53 (D. Mass. 2020) (motion to dismiss denied where, "[a]lthough plaintiff does not

17

describe each kind of Tom's product she purchased or attach particular dates to her purchases, she does contend that she was misled into purchasing Tom's Products advertised as "natural" in Massachusetts and Rhode Island regularly since December 5, 2015") ; *Blue Cross and Blue Shield of North Carolina v. Rite Aid Corp.*, 519 F. Supp. 3d 522 (D. Minn. 2021) (while the heightened pleading standard for fraud requires particularity in pleading, a complaint need not be filled with precise detail; rather, the rule governing the heightened pleading standard for fraud is to be read in the context of the general principles of the Federal Rules, the purpose of which is to simplify pleading).

Here, "[D]efendants do not suggest that they required any further particularity to respond to the complaint. This is not a case, after all, in which the defendant can claim that it never made the allegedly deceptive statement. Nor is this a case in which liability turns on more precise information concerning the 'when' or the 'where.' Rather, it turns on an assessment of the very particularly identified 'what' in the product label." *Dumont v. Reily Foods Co.*, 934 F.3d 35, 39 (1st Cir. 2019). Plaintiffs have met the Rule 9(b) particularity standard.

### III.    PLAINTIFFS' CHAPTER 93A CLAIM IS ADEQUATELY PLED

The Massachusetts Consumer Protection Act contains a broad prohibition against "unfair or deceptive acts or practices." M.G.L.A. c. 93A, § 2(a). M.G.L.A. c. 93A, § 9(1) provides that a cause of action under Section 9[4] may be brought by:

---

[4] There are two sections of Chapter 93A that create private rights of action. Plaintiffs bring their claim under section 9 of Chapter 93A. "[S]ection 11 entitles "[a]ny person who engages in the conduct of any trade or commerce" to bring an action for unfair or deceptive practices, whereas section 9 grants essentially the same entitlement to aggrieved consumers. Withal, section 11 affords no relief to consumers and, conversely, section 9 affords no relief to persons engaged in trade or commerce." *Cont'l Ins. Co. v. Bahnan*, 216 F.3d 150, 156 (1st Cir. 2000) (citations and internal quotation marks omitted).

> [a]ny person, other than a person entitled to bring action under section eleven of this chapter, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two [of 93A] …

To state a claim under Section 9, "a plaintiff must allege facts sufficient to establish four elements: first, that the defendant has committed an unfair or deceptive act or practice; second, that the unfair or deceptive act or practice occurred 'in the conduct of any trade or commerce;' third, that the plaintiff suffered an injury; and fourth, that the defendant's unfair or deceptive conduct was a cause of the injury." *Rafferty v. Merck & Co., Inc*., 479 Mass. 141, 161, 92 N.E.3d 1205, 1222, Prod. Liab. Rep. (CCH) P 20311 (2018) (citations omitted).

Defendants set forth three grounds for dismissal of Plaintiffs' Chapter 93A claim; all are without merit.

### A.    Defendants' Conduct Falls Squarely Within 93A's Definition of "Commerce"

Defendants argue that to "state a claim, a plaintiff must allege facts sufficient to establish a commercial relationship between the plaintiff and the defendant." (Defs.' Brf. at 21 (emphasis omitted). This is an incomplete statement of the law. "The language of G. L. c. 93A, §§ 1, 9(1), allows *any* person who has been injured by trade or commerce *indirectly* affecting the people of this Commonwealth to bring a cause of action." *Ciardi v. F. Hoffmann-La Roche, Ltd*., 436 Mass. 53, 762 N.E.2d 303, 309-10 (2002); *Moniz v. Bayer Corp*., 484 F. Supp. 2d 228, 230 (D. Mass. 2007); *Ryan v. Greif, Inc.*, 708 F. Supp. 3d 148, 179 (D. Mass. 2023)  ("While there must be some kind of commercial link, a consumer action under Section 9 of the statute has a lower burden in establishing a commercial relationship than an action between two businesses under Section 11.").

All that is required under Section 9 is "some business, commercial, or transactional relationship", which exists in this case because Defendants' conduct "has [had] an indirect effect on the people of the Commonwealth." *Courtemanche v. Motorola Sols., Inc*., No. 4:24-CV-40030-MRG, 2025 WL 951401, at *9 (D. Mass. Mar. 28, 2025) (plaintiffs met burden on commercial

relationship requirement where defendant marketed and sold products; and separately, even though plaintiffs were not direct purchasers of the products at issue, the third party commercial contract was undertaken by a state agency purportedly working in service of the public, including the plaintiffs); *Green v. Sirchie Acquisition Co. LLC*, 633 F. Supp. 3d 393, 403 (D. Mass. 2022) (an individual need only allege that he was injured by a defendant's wrongful act to bring a 93A claim; privity of contract with the defendant is not required).

Defendants were engaged in trade or commerce in their creation, publishing, and promotion of the Literacy Products. Section 1(b) defines "trade" and "commerce" as follows:

> "Trade" and "commerce" shall include **the advertising, the offering for sale,** rent or lease, **the sale**, rent, lease, **or distribution of any services and any property**, tangible or intangible, real, personal or mixed, any security as defined in subparagraph (k) of section four hundred and one or chapter one hundred and ten A and any contract of sale of a commodity, or thing of value wherever situate, and shall include any trade or commerce **directly or indirectly affecting the people of this commonwealth**.

G.L. c. 93A, § 1 (b) (emphasis added).

To determine whether conduct is properly classified as in trade or commerce Massachusetts courts have adopted a fact-specific, multifactor test to determine whether the challenged conduct occurred in a "business context" as opposed to a private transaction, from *Begelfer v. Najarian*, 381 Mass. 177, 409 N.E.2d 167 (1980). "Application of the *Begelfer* 'business context' test requires 'assess[ing] the nature of the transaction, the character of the parties involved, and the activities engaged in by the parties    Other relevant factors are whether similar transactions have been undertaken in the past, whether the transaction is motivated by business or personal reasons ... and whether the participant played an active part in the transaction.'" *Begelfer, supra* at 191, 409 N.E.2d 167." *Linkage Corp. v. Trs. of Bos. Univ.*, 425 Mass. 1, 24, 679 N.E.2d 191, 207 (1997).

Importantly, the *Belgefer* test focuses on the *defendant's* conduct, rather than the plaintiff's. As one court explained:

> [I]t is the defendant's—not necessarily the plaintiffs'—motivation for the transaction that should guide the court's assessment of whether the acts complained of were committed within a business context. *See, e.g., Planned Parenthood Fed'n of Am., Inc. v. Problem Pregnancy of Worcester, Inc.,* 398 Mass. 480, 493–94, 498 N.E.2d 1044 (1986). In this regard, chapter 93A unquestionably imposes liability on those who seek to gain financially from their unfair practices. *Poznik v. Massachusetts Med. Prof'l Ins. Ass'n,* 417 Mass. 48, 53, 628 N.E.2d 1 (1994).

*Dushkin v. Desai,* 18 F. Supp. 2d 117, 125–26 (D. Mass. 1998); *see also Maillet v. ATF-Davidson Co.,* 407 Mass. 185, 190 (1990) (injured employee of the entity that purchased the offending product was permitted to bring a 93A claim against the manufacturer, even though the employee himself did not purchase or engage in any economic transaction related to the product); *Clegg v. Butler,* 424 Mass. 413, 418–19 (1997) (injured drivers were permitted to bring 93A claims against the other driver's liability insurers for unfair conduct in settling their claims; the broadly inclusive word "person" in Section 9 and prior case law concerning a relevant insurance statute "are both clear affirmations of third-party rights" under Ch. 93A); *Cohen v. Brokers' Serv. Mktg. Grp. II, LLC,* 87 Mass. App. Ct. 1121 (2015) (plaintiffs whose money was stolen by a broker asserted 93A § 9 claims against an insurance company agent that failed to investigate or disclose the broker's criminal history or pattern of stealing money from other clients.; court rejected the defendant's argument that the 93A claim should fail because the plaintiffs neither had direct contact with the defendant nor even knew of its existence during the relevant events); *Lines v. Stokes & Levin, Inc.,* No. 071653, 2008 WL 2745286, at *3 (Mass. Super. July 6, 2008) (final judgment in favor of plaintiff on 93A claims against process server hired by SEC that failed to serve plaintiff and instead falsified return of service); *Hanna v. Williams,* No. 1684CV0722BLS1, 2017 WL 2292756, at *8 (Mass. Super. Jan. 9, 2017) (the court permitted heirs of an individual who had been defrauded by

lawyers and financial advisors to bring a 93A § 9 claim; plaintiff and defendants had an "indirect commercial relationship" which court defined to include "the relationship between a plaintiff who suffers an injury from wrongful conduct, regardless of whether the plaintiff purchased goods or services involved in perpetrating the wrongful conduct."); *Rafferty v. Merck & Co.*, 479 Mass. 141, 161-162, 92 N.E.3d 1205, 1223 (2018) (to satisfy "trade or commerce" requirement in failure to warn claim under Section 9, it "suffices that the plaintiff used the product, even if it was sold to another, and was injured as a result of the defendant's failure to warn").

It is clear that Defendants here were acting in a "business context" driven by a profit motive and, therefore, in commerce, under the *Begelfer* test: the conduct at issue involves the arms-length marketing and sale of commercial products—the Literacy Products—for money; Defendants engaged in this conduct for the purpose of making money and Defendants routinely engage in the business of marketing and selling their Literacy Products; and there is no indication that Defendants engaged in any altruistic or public activities in the course of marketing and selling the Literacy Products. Finally, the conduct was clearly motivated by Defendants' business interests and all Defendants were directly involved in marketing and selling the Literacy Products.

### B.    Defendants' Conduct Was Unfair

"[A] practice or act will be unfair under [Chapter 93A], if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; **or** (3) causes substantial injury to [consumers,] competitors or other business people." *Heller Fin. v. Ins. Co. of N. Am.*, 410 Mass. 400, 573 N.E.2d 8, 12-13 (1991). Under this rubric, the legality of the challenged act or practice is not dispositive of its unfairness. *See Mechs. Nat'l Bank of Worcester v. Killeen,* 377 Mass. 100, 384 N.E.2d 1231, 1237 (1979). In Massachusetts, the finder of fact determines "what constitutes an unfair trade practice," but its determination is nevertheless "subject to [a reviewing] court's ... legal gate-keeping function." *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc*, 552 F.3d 47, 69 (1st Cir. 2009).

*Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 79–80 (1st Cir. 2020) (emphasis added). A plaintiff need only establish one of the three possible prongs of the rubric to state a claim for unfair practices under Chapter 93A. *Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 80 (1st Cir. 2020) (emphasis added).

An "unfair" act is "immoral, unethical, oppressive, or unscrupulous" *Linkage Corp. v. Trs. of Bos. Univ.,* 425 Mass. 1, 679 N.E.2d 191, 209 (1997) (quoting *PMP Assocs., Inc. v. Globe Newspaper Co*., 366 Mass. 593, 321 N.E.2d 915, 917 (1975)). "[U]nfairness is to be measured not simply by determining whether particular conduct is lawful apart from G.L. c. 93A but also by analyzing the effect of the conduct on the public." *Schubach v. Household Fin. Corp*., 375 Mass. 133, 137 (Mass. 1978) (finding that Chapter 93A "created new substantive rights by making conduct unlawful which was not unlawful under the common law or any prior statute"). "The crucial factors in an unfairness inquiry are the nature of [the] challenged conduct and on the purpose and effect of that conduct." *Cognitive Edge Pte Ltd. v. Code Genesys, LLC*, No. 1:19-CV-12123-IT, 2021 WL 2829555, at *12 (D. Mass. Jan. 19, 2021), *amended in part*, No. 1:19-CV-12123-IT, 2021 WL 4477434 (D. Mass. Sept. 30, 2021) (citations and internal quotation marks omitted). An act or practice may be unfair within the meaning of Chapter 93A without being deceptive or fraudulent. *Tomasella v. Nestle USA, Inc*., 962 F.3d 60, 79 (1st Cir. 2020).

Plaintiffs' allegations here clearly meet the second and third prongs of the rubric.

*First*, the conduct described in the Amended Complaint is immoral, unethical, oppressive, and unscrupulous. See Am. Compl. ¶ 131 ("Defendants' conduct in making [the False R]epresentations and choosing to omit clear warnings about their products' known deficiencies was at a minimum deceptive and unfair, if not willful, wanton, malicious, reckless, oppressive, and/or fraudulent."); Am. Compl. ¶ 56 (Defendants' misconduct was motivated by their desire to

increase sales of the Literacy Products). Thus, the Amended Complaint meets the plausibility requirements of the unfairness prong on this basis of these allegations. *See Green v. Sirchie Acquisition Co. LLC*, 633 F. Supp. 3d 393, 403 (D. Mass. 2022) ("The plaintiffs' allegations that [defendant] knowingly disseminated misleading training materials satisfy the pleading requirements of Chapter 93A. Those allegations describe "failure[s] to warn," … "half truth[s]," …, and "negligent misrepresentation[s] of fact" on the part of [defendant]… The inmate plaintiffs have adequately alleged both deceptive and unfair business practices, on the part of both defendants, that would constitute violations of Chapter 93A if proven at trial."); *Advance Dx, Inc. v. YourBio Health, Inc.,* 753 F. Supp. 3d 53, 74 (D. Mass. 2024) (allegations that statements in study which was promoted by defendant were false "constitute use of unfair and methods of competition and a series of deceptive acts" and were sufficient at the motion to dismiss stage "at which no factfinding functions are conducted").

Moreover, the Amended Complaint charges Defendants with knowingly disseminating misleading advertisements "which have had devastating consequences" on literacy levels for school children. Am. Compl. ¶ 6; *see also* Am. Compl. ¶¶ 88-107. Plaintiffs allege in the Amended Complaint that S.C. "was taught cueing through Heinemann's *Units of Study*, and then received ineffective assistance through Heinemann's *Leveled Literacy Intervention,* resulting in her reading delays going unnoticed for years"; "K.C., was exposed to *Units of Study* and *Leveled Literacy Intervention* from kindergarten through second grade"; and R.H., was taught using *Units of Study* and *Leveled Literacy Intervention* and received defective assessments through BAS." Am. Compl. ¶¶ 103-107.

"The schools and school districts that purchased the Literacy Products—including those that Plaintiffs attended—did so in reliance upon Defendants' misrepresentations that their Literacy

Products were science-backed and entered into contracts to purchase the Literacy Products to teach students, including Plaintiffs, to read." Am. Compl. ¶ 57. Had Defendants been truthful regarding the efficacy—or lack thereof—of their Literacy Products, Plaintiffs' school districts would not have used and relied on the Literacy Products to teach students to read. Am. Compl. ¶ 94 ("harms caused by reliance on Defendants' products"); ¶ 121 ("Because of Defendants' unfair and deceptive acts, Plaintiffs and the Class Members suffered ascertainable injuries and losses…"), ¶¶ 132 -133 (Defendants' misrepresentations induced schools to buy the defective Literacy Products which proximately resulted in the injuries and damages alleged").

Defendants' misconduct has caused substantial injury to consumers and satisfies the requirements of pleading unfairness under 93A on that basis. *Lee v. Conagra Brands, Inc*., 958 F.3d 70, 80 (1st Cir. 2020) (consumer plausibly alleged injury to support putative class claim that "100% Natural" label on cooking oil violated Chapter 93A because the oil contained GMOs based on allegations that GMO-free oil was sold at premium price as compared to oils containing GMOs, that consumers were willing to pay more for food products containing no GMOs, and that the deceptive label caused consumers to pay that higher price for oil that did contain GMOs); *Klairmont v. Gainsboro Restaurant, Inc*., 465 Mass. 165, 188, 987 N.E.2d 1247, 1264–1265 (2013) (evidence sufficient to permit judge to conclude that defendants' violation of building code was the cause of restaurant patron's fatal fall down a staircase).

### C.    Defendants' Unsubstantiated Advertising Claims and Nondisclosure of Material Facts Constitute Deceptive Conduct

Separately, the Amended Complaint states a Chapter 93A claim premised on Defendants' deceptive acts. "To plausibly state a Chapter 93A claim premised on a deceptive act, the plaintiff must allege (1) a deceptive act or practice on the part of the seller; (2) an injury or loss suffered by the consumer; and (3) a causal connection between the seller's deceptive act or practice and the

consumer's injury." *Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 71 (1st Cir. 2020) (citing *Casavant v. Norwegian Cruise Line, Ltd.*, 76 Mass.App.Ct. 73, 919 N.E.2d 165, 168-69 (2009)) (internal citation omitted). Plaintiffs here have established each of the required elements.

"A deceptive act has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted. A deceptive act need not be totally false to be actionable; it may consist of a half-truth, or even may be true as a literal matter, but still create an over-all misleading impression through failure to disclose material information. A deceptive act can also be actionable even if the defendant believed that the statement was true." *Green v. Sirchie Acquisition Co. LLC*, 633 F. Supp. 3d 393, 403 (D. Mass. 2022) (internal citation and quotation marks omitted); *Aspinall v. Philip Morris Cos.*, 442 Mass. 381, 394, 813 N.E.2d 476 (2004) ("[A]dvertising need not be totally false in order to be deemed deceptive in the context of [Chapter] 93A.").

> In determining whether an act or practice is deceptive, regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which [the act or practice] might reasonably be expected to have upon the general public… An actionable deceptive act could include an affirmative misrepresentation or an omission. … An omission is a failure to disclose to another a fact that [one] knows may justifiably induce the other to act or refrain from acting in a business transaction ... [if one] is under a duty to the other to exercise reasonable care to disclose the matter in question.

*Schuster v. Wynn Ma, LLC*, 118 F.4th 30, 43 (1st Cir. 2024) (internal citations and quotation marks omitted) (brackets in original).

As set forth previously, Plaintiffs specifically allege that Defendants knowingly disseminated the False Representations regarding the Literacy Products and failed to disclose that the Literacy Products do not actually contain phonics instruction and were not subject to adequate testing. The allegations that Defendants misrepresented that the Literacy Materials were research-backed amount to mis-statements of fact rather than statements of opinion and satisfy the pleading

requirements of Chapter 93A.  See e.g. *Ferring Pharms., Inc. v. Braintree Lab'ys, Inc.*, 38 F. Supp. 3d 169, 178 (D. Mass. 2014) (finding that a claim that a drug had a "'superior cleansing efficacy,' [when] backed up by study results, [was] not mere 'puffery'"); *Green v. Sirchie Acquisition Co. LLC*, 633 F. Supp. 3d 393, 403 (D. Mass. 2022) (denying motion to dismiss because allegations describing failures to warn and negligent misrepresentations of fact constitute violations of Chapter 93A if proven at trial); *Lee v. Conagra Brands, Inc.*, 958 F.3d 70, 79 (1st Cir. 2020) ("We decline to wade into the debate over the best definition of "natural." At this stage, we need only decide whether Lee has plausibly alleged that a reasonable consumer might think that "100% Natural" means that a product contains no GMOs, and then base her purchasing decision on that belief… Lee has met that low threshold, so her claim may proceed."); *Advance Dx, Inc. v. YourBio Health, Inc.,* 753 F. Supp. 3d 53, 74 (D. Mass. 2024) (allegations regarding false statements in study sufficient at the motion to dismiss stage).

And, the Amended Complaint includes the requisite allegations concerning causation and injury.  As to causation, Plaintiffs' schools "purchased the Literacy Products… in reliance upon Defendants' misrepresentations that their Literacy Products were science-backed and entered into contracts to purchase the Literacy Products to teach students, including Plaintiffs, to read;… that Defendants owed a duty of good faith and fair dealing to the schools and school districts that purchased the Literacy Products and to Plaintiffs whom Defendants obviously had reason to know would be taught using their Literacy Products…. [and that Defendants deceptive conduct constitutes a] "breach[] [of] their duty of good faith and fair dealing not only to the schools and school districts, but also to the students who attended those schools who are third party beneficiaries of the contracts their schools entered into with Defendants."  Am. Compl. ¶ 57.  Thus, Plaintiffs have "alleged a connection between [themselves] and the [D]efendants, albeit an indirect

one, as parties to consumer transactions", because Defendants are creating "and distributing [Literacy Products] that are intended for use by persons exactly like… [P]laintiff[s], the ultimate consumer[s]." *Ciardi v. F. Hoffmann-La Roche, Ltd*., 436 Mass 53, 65, 762 N.E.2d 303, 313 (2002).

With respect to injury, Plaintiffs and other children have suffered catastrophic consequences because of Defendants' deceptive conduct. Am. Compl. ¶¶ 88-89. Plaintiffs are entitled to present evidence to prove the truth of their allegations that Defendants' False Representations caused their schools to purchase and use the Literacy Materials in the first instance, and Plaintiffs' injuries as a result. See *Klairmont v. Gainsboro Rest., Inc.*, 465 Mass. 165, 188, 987 N.E.2d 1247, 1264 (2013) (evidence was sufficient to show that restaurant owners' violation of unfair business practices statute, constructing and maintaining a stairway that was dangerous and noncompliant with building code, caused restaurant patron's fall down the stairway and his death).

## IV.    PLAINTIFFS STATE CLAIMS FOR NEGLIGENT MISREPRESENTATION AND NEGLIGENCE

"In order to recover for negligent misrepresentation a plaintiff need only prove that the defendant, in the course of his business, negligently supplied false information for the guidance of others in their business transactions resulting in pecuniary loss to others who had reasonably relied thereon." *Cumis Ins. Soc., Inc. v. BJ's Wholesale Club*, No. 20051158J, 2008 WL 2345865, at *3 (Mass. Super. June 4, 2008), *aff'd sub nom. Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 455 Mass. 458, 918 N.E.2d 36 (2009). Plaintiffs here have pleaded as follows:

> The schools and school districts that purchased the Literacy Products—including those that Plaintiffs attended—did so in reliance upon Defendants' misrepresentations that their Literacy Products were science-backed and entered into contracts to purchase the Literacy Products to teach students, including Plaintiffs, to read. Defendants owed a duty of good faith and fair dealing to the

28

> schools and school districts that purchased the Literacy Products and to Plaintiffs whom Defendants obviously had reason to know would be taught using their Literacy Products.  By engaging in their fraudulent and unfair course of conduct as described herein, Defendants breached their duty of good faith and fair dealing not only to the schools and school districts, but also to the students who attended those schools who are third party beneficiaries of the contracts their schools entered into with Defendants.

Am. Compl. ¶ 57.  These allegations exemplify the so-called "*Craig* principle of foreseeable reliance," which is "limited to situations where the defendant knew that a particular plaintiff would rely on the defendant's services." *Cumis Ins. Soc., Inc. v. BJ's Wholesale Club*, No. 20051158J, 2008 WL 2345865, at *4 (Mass. Super. June 4, 2008), *aff'd sub nom. Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 455 Mass. 458, 918 N.E.2d 36 (2009) (citing *Nycal v. KPMG Peat Marwick, LLP,* 426 Mass. 491, 495-96 (1996), citing *Craig v. Everett M. Brook Co.,* 351 Mass. 497 (1967)). Certainly, Defendants here knew that schools and students would rely on their Literacy Products for the purpose of teaching literacy skills—this is precisely the purpose for which the Literacy Products are advertised.  *See Nota Const. Corp. v. Keyes Associates, Inc*., 45 Mass. App. Ct. 15, 21, 694 N.E.2d 401 (1998) ("The Supreme Judicial Court [in *Craig*] has held that liability will be imposed in Massachusetts for the negligent furnishing of services to one not a party to the contract where the defendant knows that the party will rely on his services."); *Stone/Congress v. Town of Andover*, 6 Mass. L. Rptr. 330, 1997 WL 11737 (Mass. Super. Ct. 1997) (denying the defendant-architect's summary judgment claim and holding that the economic loss doctrine was not applicable where the architect knew that the contractor would be relying on its plans); *Nestlenook, Inc. v. Atlantic Design Engineers*, 17 Mass. L. Rptr. 25, 2003 WL 22670881 (Mass. Super. Ct. 2003) (same); *Nycal Corp. v. KPMG Peat Marwick LLP*, 426 Mass. 491, 494, 688 N.E.2d 1368 (1998) (involving an accounting professional).

*Second*, Defendants assert that the economic loss doctrine bars Plaintiffs' negligence claim[5] and that Plaintiffs have not plausibly pleaded the breach and causation elements of the claim. All of these contentions are without merit.

The Amended Complaint details that Plaintiffs' injuries, in addition to including economic loss, including "devastating setbacks in their educational development." Am. Compl. ¶ 89; see also ¶ 103 (describing S.C.'s educational delays and literacy deficiencies); ¶ 104 (describing K.C.'s failure to develop appropriate literacy skills); ¶ 106 (describing R.H.'s reading deficits). Indeed, the children who did not learn to read proficiently could be expected to suffer trauma and embarrassment when that fact was revealed to their teachers, classmates, and families. Thus, the injuries Plaintiffs' suffered with respect to their educational development constitute injuries beyond purely economic harm for which they can recover. *Maio v. TD Bank, N.A.*, No. 1:22-CV-10578-AK, 2023 WL 2465799, at *4 (D. Mass. Mar. 10, 2023) ("Plaintiffs' allegations of lost sleep, anxiety, and depression are sufficient to satisfy the exception to the economic loss doctrine at this stage of the proceedings."); *Islam v. Option One Mortg. Corp.*, 432 F. Supp. 2d 181, 189 & n.8 (D. Mass. 2006) (noting that plaintiffs "allege[d] more than economic harm" when they alleged that the defendant's "negligence resulted in 'emotional and psychological harm, medical expenses, lost enjoyment of life and economic harm' " and "severe emotional distress manifested by objective symptomology"); *McCormick v. Lischynsky*, No. 19-10433-FDS, 2019 WL 3429242, at *5 (D. Mass. July 30, 2019) (explaining that the "complaint specifically alleges that Sara deliberately absconded with the bulk of Patrick's estate, which caused Dora to suffer 'severe

---

[5] The economic loss doctrine does not apply to negligent misrepresentation claims. *Berezin v. FCA US, LLC*, No. CV 21-10852-FDS, 2022 WL 488411, at *8 (D. Mass. Feb. 17, 2022).

emotional distress, with physical manifestations thereof,'" which "alleges a 'personal injury' sufficient to overcome the economic-loss doctrine" at the motion to dismiss stage).

And, "when a seller promotes a product suggesting a particular use, harms that result from that suggested use are foreseeable." *M. S. v. Amazon.com, Inc.*, No. 3:23-CV-0046, 2023 WL 8283642, at *4 (S.D.W. Va. Nov. 30, 2023). The Literacy Products at issue were used for their intended purposes and Defendants "cannot claim shock" that Plaintiffs and the Class were harmed when they knew or should have known that omitting phonics would result in students' literacy deficiencies. *King v. Kayak Mfg. Corp.*, 182 W.Va. 276, 387 S.E.2d 511, 522–23 (W. Va. 1989) (recognizing a defendant's "advertising or promotional material concerning the uses of the product are a part of [the] reasonable use[s] of the product") (citing sources).

In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act. Restatement (Second) of Torts § 302 (1965). The Amended Complaint details two separate duties to Plaintiffs that Defendants breached: first, the duty of good faith and fair dealing that they owed to Plaintiffs who are known third party beneficiaries of the contracts their schools entered with Defendants, Am. Compl. ¶ 57, and second, the duty to exercise reasonable care and competence in communicating information in, and the marketing and selling of, their Literacy Products, including a duty not to cause foreseeable harm to others. Am. Compl. ¶ 128.

A duty of care arises in any relationship where an information provider provides information for the business guidance of another in a transaction that involves a pecuniary or other business interest. *See* Restatement (Second) of Torts § 552 (1977); *see also Hanberry v. Hearst Corp.*, 81 Cal. Rptr. 519, 521-22 (Cal. Ct. App. 1969) (magazine gave defective product its "Consumer Guaranty" seal of approval, thereby creating a duty of care to consumers of the

endorsed product); *Braun v. Soldier of Fortune Magazine, Inc*., 968 F.2d 1110, 1114-15, 1119 (11th Cir. 1992) (under Georgia law, a magazine had a legal duty to refrain from publishing advertisements that subjected the public to a clearly identifiable unreasonable risk of harm from violent criminal activity; "the First Amendment permits a state to impose upon a publisher liability for compensatory damages for negligently publishing a commercial advertisement where the ad on its face, and without the need for investigation, makes it apparent that there is a substantial danger of harm to the public").

As explained in Sections II and III, Defendants falsely and deceptively marketing the Literacy Products, which constitutes a breach of their duties to Plaintiffs.  Am. Compl. ¶ 130.

## V.    FALSE ADVERTISING

As set forth in Section I, Defendants are wrong in asserting that the court cannot resolve this dispute because it concerns an educational theory.

And, inasmuch as Defendants' arguments concerning the plausibility of Plaintiffs' allegations of the Chapter 93A claim are wrong, *see* Section III, so too are Defendants' positions concerning the false advertising claim that are made on the same basis.

## VI.    PLAINTIFFS HAVE NOT ASSERTED PRODUCTS LIABILITY CLAIMS AGAINST DEFENDANTS

Defendants' briefing addressing the application of products liability theory to books and ideas, *see* Defs.' Brf. at 31-33, is merely a distraction.  Plaintiffs' claims for violations of Chapter 93A and False Advertising have nothing to do with products liability theories.  These causes of action address Defendants' intentional fraudulent and unfair misrepresentations and course of conduct.

Further, the only Massachusetts case upon which Defendants rely is inapposite.  In *Garcia v. Kusan, Inc.*, 39 Mass. App. Ct. 322, 655 N.E.2d 1290 (1995), a student who was injured when

struck in eye by floor hockey stick during gym class brought a breach of warranty, and negligence action against producer/disseminator of floor hockey game, *i.e.*, concept and instructions. Rather than asserting that the hockey stick was defective, the plaintiff argued that the defendant's representations that hockey could be played safely without the need for eye protection should result in liability under theories of negligence and breach of warranty. The court of appeals affirmed summary judgment in favor of defendant, concluding that "liability for failure to warn, negligent misrepresentation, or breach of warranty may not be imposed in this case based on its dissemination of product literature or rules of the game in the absence of evidence that [the plaintiff's] injury was caused by any equipment made or supplied by that defendant." *Garcia*, 39 Mass. App. Ct. at 323-24.

This case is distinguishable because there is no debate that the Literacy Materials at issue were created and published by the Defendants and because Plaintiffs assert claims for violations of Chapter 93A (Count I) and False Advertising (Count III) – which *Garcia* did not address. Hence, Defendants' attempts to re-cast the case so as to avoid liability for their misrepresentations should be roundly rejected by the Court.

## VII.    CLASS ALLEGATIONS

"[S]triking class allegations is generally disfavored in the early stages of litigation." *Crommelin v. Takeda Pharms. U.S.A., Inc.*, 747 F. Supp. 3d 304, 309 (D. Mass. 2024) (citing *Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 59 (1st Cir. 2013)).[6]

---

[6] This case stands in stark contrast to *Crommelin*, where the court granted the motion to strike nationwide class allegations for breach of express warranty due to "tremendous differences among state warranty laws." 747 F.Supp.3d at 309. Here, however, Plaintiffs assert Massachusetts state law claims on behalf of themselves and a Massachusetts Class. Am. Compl. ¶ 109. The court's holding in *Crommelin* notwithstanding, other courts have denied motions to strike class allegations on the basis of variations in state laws recognizing, *inter alia*, that to do so would be premature

> [C]ourts should exercise caution when striking class action allegations based solely on the pleadings, for two reasons. First, while ruling on a motion to strike is committed to the district court's sound judgment, such motions are narrow in scope, disfavored in practice, and not calculated readily to invoke the court's discretion… This is so because striking a portion of a pleading is a drastic remedy and ... it is often sought by the movant simply as a dilatory or harassing tactic… Second, courts have repeatedly emphasized that striking class allegations under Rule 12(f) is even more disfavored because it requires a reviewing court to preemptively terminate the class aspects of ... litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification…Accordingly, a court should typically await the development of a factual record before determining whether the case should move forward on a representative basis.

*Manning*, 725 F.3d at 59 (citations and internal quotation marks omitted). Striking the class allegations in this case, at this procedural stage, would be improper.

First, Plaintiffs all suffered from reading delays due to their schools' use of the Literacy Products. While the Amended Complaint does not specifically allege that Plaintiffs failed to meet state benchmarks, this issue can be cured at the time of class certification (or through the filing of an amended complaint if this Court deems that necessary.) In any case, schools have tools, like assessments, that they use to regularly assess instructional efficacy including reading. Discovery will allow Plaintiffs to identify particular testing utilized by schools that would identify students whose literacy skills are less than proficient.

Next, if the Court determines that the element of the proposed class definition requires members to have "suffered related developmental, emotional, and/or financial injuries as a result" creates an improper fail-safe class, that language can be revised or deleted.[7]  *Royal Park Invs.*

---

and that the court had many tools at its disposal to address these concerns. See e.g. *In re Evenflo Co., Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 707 F. Supp. 3d 103, 141 (D. Mass. 2023)

[7] "A putative class is an impermissible fail-safe when defined based on terms which depend on the outcome of the subsequent litigation, i.e., a class defined in terms of the legal injury… A class definition that run[s] afoul to the proscription on fail-safe classes can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis."

*SA/NV v. Bank of New York Mellon*, No. 1:14-CV-6502-GHW, 2019 WL 652841, at \*4 (S.D.N.Y. Feb. 15, 2019) ("the reference in [the] proposed class definition to certificate holders who 'were damaged as a result of [the defendant's] conduct alleged in the Complaint' does not require that, in order to be a member of the class, a potential plaintiff must be found to have actually suffered legally compensable damages. Instead, it simply conveys the requirement that all members of the class have standing to assert their claims); *Schuh v. HCA Holdings, Inc.*, No. 3:11-01033, 2014 WL 4716231, at \*13 (M.D. Tenn. Sept. 22, 2014) (with deletion of disputed language, the court concluded that the class was readily ascertainable based upon objective criteria).

Where, as here, "'it is not obvious from the pleadings that'… a potential fail-safe issue cannot be solved by refining the class definition[,]… and [g]iven that Plaintiffs have not filed a motion for class certification and the parties have not yet completed discovery before such motion will be filed, …the Court [should] 'await the development of a factual record before determining whether the case should move forward on a representative basis.'"[8] *Douglas v. EF Inst. for Cultural Exch., Inc.*, No. 20-CV-11740-DJC, 2023 WL 1993499, at \*5 (D. Mass. Feb. 14, 2023) (quoting *Manning*, 725 F.3d at 59); *O'Hara v. Diageo-Guinness, USA, Inc.*, 306 F. Supp. 3d 441, 468 (D. Mass. 2018) ("issues of over-breadth and fail-safe definitions can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis") (internal citations and quotation marks omitted); *Urella v. Verizon New England Inc.*, No. CV 22-11606-FDS, 2024 WL 1075300, at \*6 (D. Mass. Mar. 12, 2024) (declining to dismiss an

_____

*Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376, 391 (D. Mass. 2024) (internal quotation marks and citations omitted) (brackets in original).

[8] To the extent the Court concludes otherwise, granting Plaintiffs leave to revise the class definition would be the appropriate remedy, rather than dismissal of the class allegations in their entirety. *See O'Hara v. Diageo-Guinness, USA, Inc.*, 306 F.Supp.3d 441, 468 (D. Mass. 2018) ("issues of over-breadth and fail-safe definitions can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis").

allegedly fail-safe class); *Costa v. Dvinci Energy, Inc.*, 342 F.R.D. 38, 40-41 (D. Mass. 2022) (same); *Cristostomo v. New Balance Athletics, Inc.*, 647 F. Supp. 3d 1, 14 (D. Mass. 2022) ("the plaintiffs have adequately plead their claim under Mass. Gen. Laws Ch. 93A and the MMWA, the striking of a nationwide class would be premature at this stage"); *Tassinari v. Salvation Army Nat'l Corp.*, 610 F. Supp. 3d 343, 362 (D. Mass. 2022) (denying motion to strike because "arguments are premature at [the motion to dismiss] phase given the undeveloped state of the record and the First Circuit's cautionary guidance regarding striking class allegations").

Under the same rationale, Defendants' concerns regarding administrative feasibility and the potential for individualized inquiries should be assessed after discovery. "Plaintiffs all assert claims based on the same set of written misrepresentations, which appeared on retail websites…", [and] the Court should not strike the class allegations prior to discovery and the class certification stage. *In re Evenflo Co., Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 707 F. Supp. 3d 103, 141-142 (D. Mass. 2023). The motion to strike class allegations should be denied. See *Douglas v. EF Inst. for Cultural Exch., Inc.*, No. 20-CV-11740-DJC, 2023 WL 1993499, at *5 (D. Mass. Feb. 14, 2023) (denying motion to strike class allegations at motion to dismiss stage where it was not obvious that the proceeding cannot possible move forward on a classwide basis"); *Urella v. Verizon New England Inc.*, No. CV 22-11606-FDS, 2024 WL 1075300, at *6 (D. Mass. Mar. 12, 2024) ("Because motions to strike are disfavored, and because the class definition may be refined through the certification process, the Court will not strike the class allegations."); *Costa v. Dvinci Energy, Inc.*, 342 F.R.D. 38, 40-41 (D. Mass. 2022) (declining to dismiss an allegedly fail-safe class); *Douglas v. EF Inst. for Cultural Exch., Inc.*, 2023 WL 1993499, at *5 (D. Mass. Feb. 14, 2023) ("It is not obvious from the pleadings that the proceeding cannot possibly move forward on a classwide basis, or that a potential fail-safe issue cannot be solved by refining the class definition.").

## VIII.   PLAINTIFFS HAVE ADEQUATELY PLED THE INDIVIDUAL DEFENDANTS' MISCONDUCT

Plaintiffs have alleged facts concerning each of the individual Defendants and the claims against them should not be dismissed.

Plaintiffs allege that HMH—not just its subsidiary Heinemann—publishes, markets, and sells the Literacy Products which contain the False Representations.  Am. Compl. ¶¶ 23, 39, 40.

Fountas and Pinnel created the F&P Literacy Products which contain the False Representations.  Am. Compl. ¶¶ 20-21.  The F&P Literacy Products can be purchased through the F&P website, which contains numerous False Representations.  Am. Compl. ¶¶ 22, 52.

Calkins created the *Units of Study* Curriculum and, after stepping down as director of Teachers College Reading and Writing Project, continued offering professional development services using the *Units of Study* curriculum at Mossflower, a company she founded.  Am. Compl. ¶¶ 11, 16, 18. *Units of Study* products can be purchased through Mossflower's website, which links to the Heinemann website, where institutional purchasers are able to locate their local Heinemann Sales Representative and purchase materials online.  Am. Compl. ¶ 19.

The individual Defendants are responsible for their False Representations and omissions and may be held accountable for their misconduct as set forth in detail *supra*.

## CONCLUSION

Defendants' Motion should be denied as set forth herein. If the Court grants any part of the motion, Plaintiffs respectfully request leave to amend and provide additional allegations as the Court deems appropriate. See Fed.R.Civ.P. 15(a)(2) ("[t]he court should freely give leave [to amend] when justice so requires"); *O'Connell v. Hyatt Hotels of P.R.,* 357 F.3d 152, 154 (1st Cir.2004) (the rule reflects a liberal amendment policy).

Dated:  May 7, 2025

Respectfully submitted,

 /s/ Charles J. LaDuca*
Charles J. LaDuca*
Charles Barrett*
R. Michael Smith*
Alexandra C. Warren*
**CUNEO GILBERT & LaDUCA, LLP**
2445 M Street, NW
Suite 740
Washington, DC 20037
(202) 789-3960
charlesl@cuneolaw.com
cbarrett@cuneolaw.com
mike@cuneolaw.com
awarren@cuneolaw.com


Janet Herold* (BBO #632479)
Benjamin Elga* (BBO #697933)
**JUSTICE CATALYST LAW**
40 Rector St.
New York, NY 10006
(518) 732-6703
janet@justicecatalyst.org
belga@justicecatalyst.org

Sarah Grady* (IL #6312933)
Howard Kaplan* (IL #6306286)
Jed Glickstein* (IL #6315387)
Amelia Caramadre (BBO #710230)
Adam J. Smith* (IL #6337040)
**KAPLAN & GRADY LLC**
2071 N. Southport Ave., Ste. 205
Chicago, IL 60614
(312) 852-2184
sarah@kaplangrady.com
amelia@kaplangrady.com


*Counsel for Plaintiffs S.C., by her parent and next
fried Karrie Conley; K.C., by her parent and next*

*friend Karry Conley; and R.H. by his parent and
next friend Michele Hudak*

## <u>CERTIFICATE OF SERVICE</u>

I, Alexandra Warren, hereby certify that on May 7, 2025 the foregoing memorandum of law in opposition to Defendants' Lucy Calkins, Irene Fountas, Gay Su Pinnell, RWPN, LLC, d/b/a The Reading & Writing Project At Mossflower, LLC, Fountas and Pinnell, LLC, Greenwood Publishing Group, LLC, d/b/a Heinemann Publishing, and HMH Education Company's Motion to Dismiss The Amended Complaint for Failure to State a Claim and to Alternatively Strike the Class Allegations was electronically filed with the Clerk of the Court using the Court's electronic filing system which will serve as notification of such filing to the email addresses of all counsel of record in this action.


<u>*/s/ Alexandra Warren*</u>
Alexandra Warren